Timothy ZEHRUNG, Appellant,

v.

STATE of Alaska, Appellee.

No. 2823.

Supreme Court of Alaska.

Sept. 29, 1977.

16. *Waters v. State*, 483 P.2d 199, 202 (Alaska 1971).

Barbara J. Miracle, Asst. Public Defender, and Brian Shortell, Public Defender, Anchorage, for appellant.

Glen C. Anderson and Ivan Lawner, Asst. Dist. Attys., Anchorage, Dean J. Guaneli, Asst. Atty. Gen., Daniel W. Hickey, Deputy Atty. Gen., and Avrum M. Gross, Atty. Gen., Juneau, for appellee.

Before BOOCHEVER, Chief Justice, RABINOWITZ, CONNOR and BURKE, Justices, and DIMOND, Justice Pro Tem.

## OPINION

DIMOND, Justice Pro Tem.

Timothy Zehrung entered a plea of nolo contendere to the charge of rape following a denial by the Superior Court of his motion to suppress certain credit cards found in his wallet during an inventory search at the Anchorage jail. At the time

of plea, Zehrung expressly reserved his right to appeal the suppression issue.[1] He was sentenced to ten years imprisonment with seven years suspended. Zehrung's only point on appeal is that the Superior Court erred in refusing to suppress the two credit cards.

While driving his employer's truck, Zehrung was stopped in Anchorage by a state trooper because the truck was emitting excessive smoke. In conducting a routine investigation of the matter, the trooper discovered that there were two bench warrants out for Zehrung, one because he had failed to appear on a misdemeanor[2] and one because he had failed to pay a $25.00 fine for possession of marijuana. The trooper arrested Zehrung and took him to the city jail.

Since Zehrung claimed that the discovery of the credit cards in his wallet at the jail was the result of an illegal search and seizure, it was necessary for the Superior Court, as part of the suppression hearing, to ascertain the specific steps involved in the "booking" procedures at the jail. The testimony showed these procedures to be as follows:

An arrestee is first brought to the jail's remand desk by the arresting officer. A corrections officer asks the arrestee to empty his pockets and then frisks the arrestee. The officer checks the arrestee's wallet for money and contraband. If either is found, the officer removes them and inventories them. The officer does not ordinarily inventory other items of value located in the arrestee's wallet. Rather, all of the arrestee's property, including his wallet with money and contraband removed, is placed in a numbered canvas bag and passed to a processing officer, who does the actual booking within the secured part of the jail. The remand stage of an arrestee's processing is done immediately upon arrival at the jail. The only delays are due to other arrestees being remanded to custody.

Half an hour to six hours after remand, an arrestee is actually booked and his property is inventoried. The contents of the bag containing the arrestee's property are emptied on a table, and the processing officer, in the arrestee's presence, compiles a written inventory of the property. The contents remaining in the arrestee's wallet after removal of money and contraband are not inventoried unless the arrestee requests such an inventory. After the inventory, the arrestee's property is placed in a steel locker. However, if an arrestee makes bail, his property is returned to him after he has been fully processed. Current procedure at the jail does require complete processing of an arrestee, including inventory of his property, even if the arrestee is able to post bail at the time he arrives at the jail.

Upon his arrival at the jail, Zehrung was put in a holding cell in the remand area of the jail. He was held there for a short time while another arrestee was being remanded to custody.

Zehrung was then brought to the remand desk. He gave his personal belongings to Franklin Ellington, the corrections officer who conducted the remand stage of his processing. When checking Zehrung's wallet for money and contraband, Ellington found a small two-sided white paper packet containing two credit cards.[3] The packet was not sealed. Ellington removed it from Zehrung's wallet and removed the two credit cards from the packet. When he saw that the credit cards were not in Zehrung's name, Ellington gave the cards to the arresting officer.

After Zehrung's release on bail, the arresting officer contacted the owner of the

---

1. This is an accepted procedure in criminal cases. *See Richardson v. State*, 563 P.2d 266, 267 n. 1 (Alaska 1977); *Cooksey v. State*, 524 P.2d 1251, 1256 (Alaska 1974).

2. Zehrung had failed to appear for trial on a misdemeanor concealment of merchandise charge. He was accused of concealing a 20 amp fuse which belonged to the Sears depart-

ment store in Anchorage. The fuse was valued at 16 cents.

3. The trial judge found that it could be determined from looking at the outside of the packet that it contained credit cards. He also found, however, that it was impossible to determine who the cards belonged to without opening the paper packet.

credit cards found in Zehrung's wallet. At that time, he learned that the cards had been taken during an alleged rape and robbery. This eventually led to Zehrung's indictment on the rape charge, to which he entered a plea of nolo contendere.

A search conducted without a warrant is per se unreasonable [4] unless the search fits within one of the "few specifically established and well-delineated exceptions" to the warrant requirement.[5] The burden of proof is on the state to prove by a preponderance of the evidence that the exigencies of the situation make conduct of the search without a warrant imperative.[6]

Although there is authority indicating that property inventories by law enforcement officials are not searches within the meaning of the Fourth Amendment,[7] the state concedes for purposes of this case that the inventory of Zehrung's property was a search. In so doing, the state properly cites the decision of this court in *Schraff v. State*, 544 P.2d 834, 839 (Alaska 1975), in which we concluded that when a law enforcement officer riffles through a wallet for contents unobservable from outside the wallet, a search has been conducted. The state further concedes that there was no search warrant in this case and that, therefore, the search must fit within one of the exceptions to the warrant requirement in order to be justified.

In *Schraff, supra* at 840–41, we recognized that inventory searches by law enforcement personnel may fit within an exception to the warrant requirement. The state argues that the search of Zehrung at the Anchorage jail fits within this exception. On the other hand, Zehrung argues that any preincarceration inventory of his effects was improper because his employer had made bail for him before he was booked.

A number of courts have held that a preincarceration inventory is not proper if the arrestee, upon posting collateral, has a right to release without any incarceration.[8] In *People v. Dixon*, 392 Mich. 691, 222 N.W.2d 749 (1974), the Michigan Supreme Court invalidated a stationhouse search because the arrestee had a right to immediate release upon posting bail. While arrestees in Anchorage can obtain release by posting a predetermined bail, the procedure is not as formal as the statutory scheme discussed in *Dixon*.

The decision in *Dixon* was based in part on the arrestee's clear statutory right to release without incarceration. The Michigan court imposed on the arresting officer a duty to inform an arrestee of his right to release:

> We are persuaded, however, that the sense of the statute and its purpose of avoiding unnecessary incarceration of minor offenders can only be served by imposing on the arresting officer . . . the duty to inform the person about to be jailed of the statutory protection . . . . 222 N.W.2d at 754.

Further, the court ruled that evidence obtained in derogation of the arrestee's

---

4. *Schraff v. State*, 544 P.2d 834, 838 (Alaska 1975); *McCoy v. State*, 491 P.2d 127, 132 (Alaska 1971), *quoting Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

5. *Schraff v. State*, 544 P.2d 834, 838 (Alaska 1975), *quoting McCoy v. State*, 491 P.2d 127, 132 (Alaska 1971).

6. *Schraff v. State*, 544 P.2d 834, 838 (Alaska 1975).

7. *See South Dakota v. Opperman*, 428 U.S. 364, 370 n. 6, 96 S.Ct. 3092, 3097, 49 L.Ed.2d 1000, 1006 (1976), and cases cited therein.

8. *United States v. Mills*, 153 U.S.App.D.C. 156, 472 F.2d 1231 (1972); *People v. Dixon*, 392 Mich. 691, 222 N.W.2d 749 (1974); *State v. Gwinn*, 12 Or.App. 444, 506 P.2d 187 (1973); *People v. Overlee*, 174 Colo. 202, 483 P.2d 222 (1971). *But see People v. Brisendine*, 13 Cal.3d 528, 119 Cal.Rptr. 315, 326, 531 P.2d 1099, 1110 n. 14 (1975), *discussing United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). Although the vitality of *Mills*, *Gwinn* and *Overlee* is in doubt after the decision in *Robinson*, the decision of the Michigan Supreme Court in *Dixon* came after the *Robinson* decision.

statutory right to release on bail must be suppressed.[9]

■ No such clear statutory right to release on bail without even temporary incarceration exists in Alaska. Nevertheless, the nonstatutory rationale of *Dixon* is still applicable. The court in *Dixon* stated that because the justifications for a preincarceration inventory [10] do not exist if the arrestee is not to be incarcerated, no inventory search can be conducted in such cases.[11] We agree.

We recognize that such a decision necessitates invalidating a standard procedure at the jail. The current practice at the jail is to conduct an inventory search of all arrestees, whether or not a particular arrestee is capable of posting bail at the time he or she arrives at the jail.[12] Nevertheless, we hold that a warrantless jailhouse inventory is without justification when an arrestee is not going to be incarcerated, and it is therefore constitutionally impermissible.

The Superior Court, however, found that Zehrung did not have the capacity to make bail until after he had been moved to the secured part of the jail, which was after the credit cards had been discovered. But the testimony and other evidence on this aspect of the case leaves substantial doubt as to the accuracy of this finding.

Zehrung testified at the suppression hearing that it took 15 to 20 minutes for him to be transported from the place of arrest at Boniface and Northern Lights to the jail at Sixth and C.[13] The booking record kept by the jail indicates that Zehrung arrived at the jail at 6:35 a. m. This means that Zehrung was arrested shortly after 6:00 a.m. Zehrung also testified that when he arrived at the jail, there was one other arrestee ahead of him for processing. Zehrung was placed in an unsecured holding cell while the other person was being remanded to custody.

One of Zehrung's co-workers, a person named Ronnie, had been riding with Zehrung at the time the trooper stopped him. Clarence Morton, Zehrung's employer, testified that he received a telephone call from Ronnie between 6:00 and 6:30 that morning.[14] Ronnie told Morton that Zehrung had been arrested and taken to the jail at 6th and C and that the bail for Zehrung had been set at $125.00.

After talking to Ronnie, Morton immediately called the jail to verify the amount of Zehrung's bail and to tell the jail staff that he would be right down to pay the bail. Morton, who wanted to secure Zehrung's release before booking if possible in order that his caravan of trucks could continue without delay to Fairbanks,[15] next drove

---

**9.** *Dixon, supra* at 755. The bail schedule in *Dixon* was, as in Anchorage, set by a district court. This was done, however, pursuant to statute and court rule so authorizing. *Id.* at 753 n. 14.

**10.** These justifications are to prevent the entry of money, contraband and weapons into the jail, to protect the arrestee's property, and to protect the jail against arrestee claims for lost or damaged property. *State v. Kaluna*, 520 P.2d 51, 60–61 (Haw.1974). In connection with this, *see* Note, The Inventory Search of an Offender Arrested for a Minor Traffic Violation: Its Scope and Constitutional Requirements, 53 B.U.L.Rev. 858, 864 (1973).

**11.** 222 N.W.2d at 756.

**12.** We do not pass on whether fingerprinting and photographing an arrestee is justified where the arrestee is to be released on bail. In any event, this does not give rise to a justification for an inventory search.

**13.** No evidence was presented to contradict this.

**14.** Morton's testimony was not taken at the suppression hearing but at a fact finding hearing ordered by this court. Defense counsel was prepared to present Mr. Morton at the suppression hearing, but the trial judge prevailed upon the parties to agree to an oral stipulation presented by defense counsel as to what Morton's testimony would have been. Finding that this procedure left us with an inadequate record, we ordered the trial court to hear testimony necessary to find certain facts critical to resolution of the legal issues presented in this case.

**15.** Zehrung worked for Morton as a driver of one of the trucks in Morton's caravan of carnival trucks. He was anxious to have Zehrung released as soon as possible in order that the trucks could continue to Fairbanks.

directly to the jail. He testified that he had to wait quite a long time after telling correctional officers that he wanted to bail Zehrung out before any one took his bail money. Based on the number of events which took place that morning, the trial court estimated that "the bail was proffered and accepted at or about 7:40 a.m."

 From the sequence of events that we have related, it appears to us that the trial court's estimate is clearly erroneous.[16] While it is true that a number of events took place that morning, the trial court accepted Morton's testimony that 25 minutes had elapsed between the time he was notified of Zehrung's arrest and the time he arrived at the jail and told jail personnel that he was prepared to post Zehrung's bail. Since Morton had received the phone call notifying him of Zehrung's arrest between 6:00 and 6:30 a.m.,[17] it is apparent that Morton must have offered to post the bail by about 6:55 in the morning.

Furthermore, when Zehrung arrived at the jail at 6:35 a.m., he was placed in a holding cell in the remand area while another arrestee was being remanded to custody. There was no evidence presented as to exactly how long he was kept in this holding cell, but the state concedes that his processing was delayed by the remand of another arrestee. This means that Zehrung's processing at the remand desk did not commence until some time after his 6:35 arrival at the jail. We note also that from the evidence presented, we cannot say definitely that Morton did not in fact arrive at the jail with the bail before Zehrung's processing began or shortly thereafter.

Since all of the evidence presented indicates that Morton arrived at the jail and offered to post bail by 6:55 a.m., we cannot understand how the trial court could have

found that "the bail was proffered and accepted at about 7:40 a.m." While it may be true that the offer to post bail was not *accepted* until 7:40, it appears clear from the evidence that the offer to post bail was made well before 7:40 a.m. Thus, the court's finding, that Zehrung did not have the capacity to make bail until after he had been through the remand portion of the jail booking procedure and had been moved to the secured part of the jail for the actual booking, appears to us to be clearly erroneous.

We have detailed the foregoing sequence of events because it is important in relation to Zehrung's contention that the jail officials had an obligation to allow him an opportunity to raise his pre-set bail before beginning to process him into the jail facility and before searching him in order to compile an inventory of his personal belongings.

As we noted earlier in this opinion, we mentioned in *Schraff* that inventory searches by law enforcement personnel *may* fit within an exception to the warrant requirement. The state argues that the search of Zehrung fits within this exception. We disagree.

 Without deciding the general question of whether inventory searches in certain cases may constitute an exception to the requirement of a search warrant, we hold in this case that the search was illegal in the absence of a warrant. The jail had been provided with a bail schedule for petty offenses, the purpose of which was to afford an arrestee such as Zehrung the opportunity to avoid incarceration by posting the established bail without need to appear before a magistrate. If one is arrested for a petty offense and has sufficient funds on his person to post the established bail when

---

**16.** Zehrung's attorney properly raised this issue by filing with this court an objection to the findings of fact made by the trial court pursuant to our order directing the trial court to hold a fact finding hearing. Therefore, review of that fact finding by this court is appropriate.

**17.** No evidence was presented to contradict this. Nevertheless, the trial judge apparently

disbelieved this portion of appellant's version of the events of the morning, even though all of the testimony indicated that Morton had heard from Ronnie by 6:30. The trial judge apparently did accept Morton's estimate that it took him 25 minutes to reach the jail and offer to post Zehrung's bail.

brought to the jail facility, he should be released immediately. There is no reason to subject such an arrestee to booking procedures with the resultant inventory search of his person since he is not to be incarcerated.

■ The ability to obtain this prompt release should not depend on the fortuitous circumstance of one having sufficient money on his person to post the bail at the time he arrives at the jail. Many people do not carry much cash on their person. Those persons should be permitted access to a telephone in order to get in touch with a relative, an employer, a friend, or an attorney, who could come to the stationhouse within a reasonable time and put up the necessary bail.

Jail officials contend that, if the person arrested is not promptly searched, security problems would be caused at the jail. But this argument is not persuasive. First of all, the offenses that are immediately bailable are minor in nature. Secondly, a warrantless search for weapons is permissible (See n. 39, *infra*.). And third, jail officials at the Anchorage jail regularly place persons under arrest into an unsecured holding cell before they are even remanded to custody, at which point the preliminary search is conducted. That is exactly what occurred to Zehrung when he was brought to the Anchorage jail.

■ In summary, we hold that when one is arrested and brought to a jail for a minor offense for which bail has already been set in a bail schedule, he should be allowed a reasonable opportunity to attempt to raise bail before being subjected to the remand and booking procedures and the incident inventory search.

In this case Zehrung apparently did not have the $125.00 necessary to post bail. But the facts show that shortly after he arrived at the jail, his employer, Morton, called the jail and stated that he would be right down to post the bail. He arrived at the jail and offered the bail shortly after his telephone call, which he made within minutes of Zehrung's arrest. Morton posted the bail well within the reasonable time to which Zehrung was entitled to attempt to raise bail. The jail officials had no justification for processing Zehrung through the remand and booking procedures, with the resultant search of his wallet. Further, they had no justification for keeping Morton awaiting at the jail for a considerable length of time while the processing was conducted and no justification for their failure to accept Morton's offer to post bail when he first arrived at the jail.

The only reason offered for the decision to process Zehrung into the jail, rather than to allow him to wait in the unsecured holding cell until his employer arrived, was that standard procedures at the jail so dictated. But standard procedure, no matter how efficient it may be, cannot override the constitutional right of an individual to be free from unreasonable search and seizure and his right not to have his privacy invaded by a search without a warrant.[18]

The state also contends that the inventory search at the jail was justified because it was a search incident to an arrest and, therefore, falls within another one of the exceptions to the warrant requirement. The "search incident to an arrest" exception to the warrant requirement was extensively discussed in *McCoy v. State*, 491 P.2d 127 (Alaska 1971).[19] McCoy had been arrested at the Anchorage International Airport. At that time, the arresting officer conducted a preliminary search or "frisk" for weapons. After McCoy was taken to the police station, a further, more extensive search was conducted, resulting in the discovery of a plastic-wrapped foil packet, which turned

---

**18.** The justifications offered for such "standard procedure" are to prevent the entry of money, contraband and weapons into the jail, to protect the property of the one arrested, and to protect the jail against claims for lost or damaged property. But it is apparent that none of the justifications offered by the jail to justify the inventory are applicable if the arrestee is to be released on bail within a reasonable time. *See* n.12, *supra*.

**19.** This exception was reviewed later in *Schraff v. State*, 544 P.2d 834 (Alaska 1975).

out to contain cocaine. The stationhouse search, made without a warrant, was upheld as incident to a valid arrest for forgery.[20]

In *McCoy*, we set forth the requirements of a warrantless search incident to an arrest as follows:

Adequate protection for the arrestee's legitimate interests in privacy, however, will be provided by the following restrictions on warrantless incidental searches of the person: (1) The arrest must be valid—probable cause for the arrest must exist or the search is unconstitutional. (2) The search must be roughly contemporaneous with the arrest . . . . (3) The arrest must not be a pretext for the search; a search incident to a sham arrest is not valid. . . . (4) Finally, the arrest must be for a crime, evidence of which could be concealed on a person.[21]

Zehrung does not argue that any of the first three restrictions were violated by the search of his wallet. Rather his argument turns on the fourth requirement for a valid incidental search. Zehrung contends that neither an arrest for failure to pay a fine, nor an arrest for failure to appear on a previously committed misdemeanor, is an arrest for a crime, evidence of which could be concealed on the person. Therefore, Zehrung contends that no search of his person was justified incident to arrest.[22]

In response, the state asks this court to abandon the fourth requirement of *McCoy*

in light of the decision of the United States Supreme Court in *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). In *Robinson*, the court held that

[t]he authority to search the person incident to a lawful custodial arrest, while based upon the need to disarm and to discover evidence, does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect. A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification. It is the fact of the lawful arrest which establishes the authority to search, and we hold that in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment.[23]

The state argues that under *Robinson* the fact of arrest alone justifies a full search of the person; and, therefore, the legality of an incidental search does not turn on a later court decision that the particular arrest was for a crime, evidence of which could be concealed on the person.

While the court in *Robinson* did not clearly define the term "custodial arrest"—the

---

**20.** Justices Rabinowitz and Connor dissented as to the search, without a warrant, of the opaque foil-wrapped package which contained cocaine. 491 P.2d at 142.

**21.** 491 P.2d at 138 (footnotes and citations omitted). Unlike McCoy, the search of Zehrung was made *in the course of an inventory* of his possessions while he was being processed through the normal booking procedures. Thus, it can be argued that his search was not incident to an arrest, but rather incident only to the booking procedures, which has as its final object the incarceration of the one arrested. *See* note, The Inventory Search of an Offender Arrested for a Minor Traffic Violation: Its Scope and Constitutional Requirements, 53 B.U.L.Rev. 858, 864 (1973):

The inventory search is not a search incident to arrest but is rather a search incident to incarceration. The purposes of the inventory

search do not stem from the objectives of protecting the arresting officer and discovering evidence of the crime for which the suspect was arrested. No inventory search need be conducted unless the suspect is to be incarcerated.

. . . . .

The inventory search should be viewed as incident to incarceration, and not as incident to arrest. *One search cannot in fact be both a search incident to arrest and an inventory search.* . . . (Emphasis added).

**22.** Zehrung does not contend that a pat-down for weapons was impermissible.

**23.** 414 U.S. at 235, 94 S.Ct. at 477, 38 L.Ed.2d at 440–41. *See also, Gustafson v. Florida*, 414 U.S. 260, 94 S.Ct. 488, 38 L.Ed.2d 456 (1973).

event which triggers the authority to conduct a full search of the person [24]—*Robinson* does indicate that at least where an officer has the authority to transport an arrestee to a police facility, a full search of the person is permissible. This is so even if the arrest is for a traffic offense or other offense, evidence of which is not concealable on the person, and even if the arrestee can avoid pretrial incarceration altogether by posting bond.[25]

Since the arresting officer in this case was authorized to transport Zehrung to the jail, this appeal presents the question of whether the *Robinson* rule, permitting full body searches incident to any custodial arrest, violates art. I, § 14 of the Alaska Constitution.[26] Put another way, the issue presented is whether the fourth *McCoy* limitation on searches incident to arrest, i.e., that the arrest must be for a crime, evidence of which could be concealed on a person, is required by the Alaska Constitution. This is still an open question [27] and one which we must decide in this case.

That this court has the authority to adhere to *McCoy* as a matter of state constitutional law cannot be doubted, even though to do so would impose a higher standard than is required as a matter of federal constitutional law under *Robinson*.[28] Other

---

24. *See People v. Brisendine*, 13 Cal.3d 528, 546, 119 Cal.Rptr. 315, 326, 531 P.2d 1099, 1110 n.14 (1975):

> The factual uncertainty in the Supreme Court opinion makes it extremely difficult to ascertain the parameters of the key phrase 'custodial arrest.' Although the court repeatedly utilizes this term, it nowhere defines it. In a footnote (fn. 2, p. 221 of 414 U.S., 94 S.Ct. p. 470) the court quotes the testimony of a patrolman who defined 'full custody arrest' as one in which an officer 'would arrest a subject and subsequently transport him to a police facility for booking,' but the opinion fails to indicate whether the latter requirement is a necessary concomitant of the term. Similarly, there is no mention of whether Robinson himself was to be booked. . . .

At least one court has left the way clear to escape the mandate of *Robinson* by pointing out that the *Robinson* opinion does not make clear what types of arrests its rule applies to. *See State v. Florance*, 270 Or. 169, 527 P.2d 1202 (1974), in which the Oregon Supreme Court purported to adopt the *Robinson* rule in preference to Oregon's pre-*Robinson* rule, which had afforded law enforcement personnel a more limited authority to search incident to arrest. The Oregon court sanctioned a full search of an arrestee's wallet—at least for identification purposes and at least where the arrest was for a serious offense (in that case menacing a police officer). The court expressly left open the question of whether such a full search would be permitted where the arrest is for a "minor offense." 527 P.2d at 1212. In light of the facts set forth in n.25, *infra*, the Oregon court's statement that this remains an open question under *Robinson* appears to be in error.

25. *See People v. Brisendine*, 13 Cal.3d 528, 546, 119 Cal.Rptr. 315, 326, 531 P.2d 1099, 1110 (1975):

> In *Robinson* the defendant was arrested for driving a motor vehicle after his license had

been revoked. A full field search was made and contraband was found in a crumpled cigarette package in his pocket. Although Robinson's right to post bond at the station cannot be determined from the Supreme Court opinion, the Court of Appeals had noted that 'he was clearly entitled to post either cash or bail bond, and, upon doing so, to be released immediately, without any stationhouse confinement or incident search of his person.' (*United States v. Robinson* (1972) 153 U.S.App.D.C. 114, 471 F.2d 1082, 1102–1103.) (Footnotes omitted.)

26. Alaska Constitution, art. I, § 14, provides:

> The right of the people to be secure in their persons, houses and other property, papers, and effects, against unreasonable searches and seizures, shall not be violated. No warrants shall issue, but·upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

27. *See Schraff v. State*, 544 P.2d 834, 851 n. 9 (Alaska 1975) (Rabinowitz, J., concurring in part and dissenting in part); *Hunnicutt v. State*, 527 P.2d 1292, 1294–95 (Alaska 1974). The *McCoy* requirement that the search, to be valid, must be incident to arrest for a crime, evidence of which can be concealed on the person, was reaffirmed in another pre-*Robinson* Alaska case: *Lemon v. State*, 514 P.2d 1151, 1158–59 and n.17 (Alaska 1973), which noted that "[t]he intensity of the search depends on the nature of the crime charged." The major post-*Robinson* Alaska case dealing with warrantless searches incident to arrest, *Schraff v. State*, 544 P.2d 834 (Alaska 1975), did not turn on this point.

28. *See Baker v. City of Fairbanks*, 471 P.2d 386, 402 (Alaska 1970), in which we noted that in interpreting the Alaska Constitution, we are not bound by other courts' interpretations of

state courts, in interpreting similar provisions in their constitutions, have imposed standards higher than *Robinson* provides.[29] Although the state argued here that the holding in *McCoy* has already been limited to the parameters of federal law on this point,[30] the question appears to us to be an open one.[31] Therefore, we must decide whether to abandon *McCoy* on this point or to follow the approach used by some of the other state courts which have confronted this issue.

In *State v. Kaluna*, 520 P.2d 51 (Haw. 1974), the Supreme Court of Hawaii invalidated the search of a small tissue packet found during a stationhouse strip search of a woman arrested for attempted robbery. The court recognized that, according to *Robinson*, a full search incident to custodial arrest is reasonable; and, therefore, the woman's federal constitutional rights had not been violated. Nevertheless, the Hawaii court found the search unreasonable under its state constitution. The court held that governmental intrusions into personal privacy must be no greater than absolutely necessary under the circumstances. The court found that "the bare fact" of custody alone was insufficient to justify opening the package, although a search for weapons and instrumentalities of the crime was permissible.[32]

The Hawaii court further explained its rule as follows:

[E]ach case of search and seizure without a warrant must turn on its own facts, and . . . each proffered justification for a warrantless search must meet the test of necessity inherent in the concept of reasonableness. Basically, where the nature of that offense makes it reasonable to assume that evidence of that offense may be located on the arrestee's person or in the belongings in his possession at the time of the arrest, then the police may search those areas without a warrant.

. . . . .

In sum, we hold that a search incident to a valid custodial arrest does not give rise to a unique right to search; instead, the circumstances surrounding the arrest generate the authority to search without a warrant.[33]

In *People v. Brisendine*, 13 Cal.3d 528, 119 Cal.Rptr. 315, 531 P.2d 1099 (1975), the California Supreme Court invalidated the search of an opaque plastic bottle and some envelopes found inside an arrestee's knapsack. The California court held that the

---

federal constitutional provisions concurrently found in the Alaska Constitution, but rather we are free to develop and expound our own interpretations of the provisions in Alaska's Constitution.

**29.** *People v. Clyne*, 541 P.2d 71 (Colo.1975); *People v. Brisendine*, 13 Cal.3d 528, 119 Cal. Rptr. 315, 531 P.2d 1099 (1975); *State v. Kaluna*, 520 P.2d 51 (Haw.1974).

**30.** The state relies on the following passage from *McCoy*:

While we are not bound by the United States Supreme Court's interpretations of the Fourth Amendment in expounding the corresponding section of the Alaska Constitution's Declaration of Rights, article I, section 14, we do not find this case to be an appropriate one to expand those rights in Alaska beyond their federal counterparts. 491 P.2d at 139 (footnote omitted).

This passage from *McCoy* obviously referred to pre-*Robinson* law. The court was in no position to pass on the applicability of future changes in the federal law. At the time *McCoy*

was decided, few would have predicted that the United States Supreme Court would announce a rule as broad as *Robinson* in defining the permissible scope of incidental searches under the federal constitution. *See State v. Florance*, 270 Or. 169, 527 P.2d 1202, 1208, 1210 (1974); *State v. Kaluna*, 520 P.2d 51 (Haw.1974).

**31.** *See* n. 29, *supra*.

**32.** 520 P.2d at 58–59. The court in *Kaluna* also expressly stated that although Hawaii's constitution included a guarantee against unreasonable invasions of privacy, the court's holding was based on its interpretation of Hawaii's search and seizure provision. 520 P.2d at 58 n. 6.

**33.** 520 P.2d at 60 (footnote and citations omitted). In a footnote, the court noted that in a typical drug arrest, "the nature of the offense necessarily gives the police broad latitude to search the arrestee's person for contraband which could be easily secreted and destroyed." 520 P.2d at 60 n. 8.

exigencies of the situation [34] made reasonable a pat-down of the arrestee and a search of the knapsack's contents for weapons, even though the arrest was for a charge which would not ordinarily justify taking the offender into custody and which would not even in this case lead to any incarceration or even to a booking. To intrude further than the pat-down and the knapsack search, the court required that the officer "provide additional specific and articulable facts necessitating the additional intrusion",[35] and the record was silent as to such a justification. The crime involved, camping in a forbidden area, was not a crime, evidence of which could be concealed and neither the bottle nor the envelopes were large enough to hold a weapon.

The California court expressly declined to adopt the lesser standard provided in *Robinson* as the boundary for permissible searches incident to arrest. Rather, it adopted the view of the Hawaii court in *Kaluna*, holding that "governmental intrusions into the personal privacy of citizens of this State [must] be no greater in intensity than absolutely necessary under the circumstances." [36] Further, the California court reaffirmed the rule of *People v. Superior Court of Los Angeles County*, 7 Cal.3d 186, 101 Cal.Rptr. 837, 496 P.2d 1205 (1972), in which the court held that if an arrestee is cited for an offense which typically has neither instrumentalities nor fruits, no search is allowable unless there are particular facts present which would lead the officer to believe the arrestee is armed. A pat-down, or limited search for weapons, is permissible, however, if the arrestee is taken into custody.[37]

▮ Since Zehrung's search was incident to a lawful custodial arrest, his federal

constitutional rights were not violated by the search. However, in our view, the right to be "secure . . . against unreasonable searches and seizures," under art. I, § 14 of the Alaska Constitution, requires that governmental intrusions into the personal privacy of Alaska citizens be limited in scope to that degree necessary under the particular circumstances.[38]

▮ As we noted in *Woods & Rohde, Inc. v. State*, 565 P.2d 138, 148 (Alaska 1977) and *Ellison v. State*, 383 P.2d 716, 718 (Alaska 1963), the Alaska constitutional guarantee against unreasonable searches and seizures is broader than fourth amendment guarantees. In delineating the appropriate scope of reasonable searches and seizures, we will be guided by the two-fold test first enunciated by Justice Harlan in *Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576, 588 (concurring), and adopted by this court in *Smith v. State*, 510 P.2d 793, 797 (Alaska 1973). That an individual has an actual expectation of privacy in items carried on the person is obviously true. We also hold that the expectation of privacy is one which Alaskan society would recognize as reasonable. It is a basic premise that governmental intrusions must have a justifiable purpose in order to be recognized as reasonable. *See* Aaronson & Wallace, *A Reconsideration of the Fourth Amendment's Doctrine of Search Incident to Arrest*, 64 Geo.L.J. 53, 56 (1975). We have not been presented with such a justifiable purpose in this case.

▮ For the foregoing reasons, we hold that, absent specific articulable facts justifying the intrusion, which are not present here, a warrantless search incident to an arrest, other than for weapons,[39] is

---

**34.** The arresting officers had to escort the arrestees out of an isolated national forest area, a task which took an extended period of time and which carried them across difficult terrain at night. 119 Cal.Rptr. at 320, 531 P.2d at 1104 n. 8.

**35.** 119 Cal.Rptr. at 325, 531 P.2d at 1109.

**36.** 119 Cal.Rptr. at 330, 531 P.2d at 1114, *quoting State v. Kaluna*, 520 P.2d 51, 58–59 (Haw. 1974).

**37.** 119 Cal.Rptr. at 319–320, 531 P.2d at 1103–04.

**38.** *See State v. Kaluna*, 520 P.2d 51, 58–59 (Haw.1974).

**39.** A warrantless search for weapons is permissible when one is arrested and taken into custo-

**200**

unreasonable and therefore violative of the Alaska Constitution if the charge on which the arrest is made is not one, evidence of which could be concealed on the person. Therefore, the search of Zehrung was not justified as a proper search incident to his arrest and the motion to suppress ought to have been granted.

Zehrung also asks this court to hold that a preincarceration inventory of one arrested can intrude no further than is necessary to secure such person's property. Under this principle, once the jail has obtained possession of an arrestee's wallet and ascertained his identity,[40] any further search of his wallet would violate the arrestee's rights absent a warrant. To open a container found within the wallet would constitute a further impermissible intrusion. Zehrung suggests that to protect the jail from claims for lost or damaged property, an arrestee should be offered a choice between an inventory of his wallet's contents and a waiver releasing the jail from liability for uninventoried property.[41]

However, we need not decide the question at this time. We have held that, under the circumstances of this case, since Zehrung was entitled to be released on bail without appearing before a magistrate, there was no justification whatever for processing him through the preincarceration remand and booking procedures and, as an incident to this, searching his person and his personal belongings. Further, we have held that the search of his wallet without a warrant was not justifiable as a search incident to his arrest.

The order of the Superior Court denying the motion to suppress is reversed and the case is remanded for further proceedings not inconsistent with the views expressed in this opinion.

REVERSED AND REMANDED.

BURKE, J., concurs.

ERWIN, J. not participating.

BURKE, Justice, concurring.

I agree that where a prisoner can meet the conditions necessary to gain his release, such as by the giving of bail, there is no justification for a general inventory search. In this case the search of Zehrung's wallet and its contents went well beyond that which was required to assure that he did not possess a weapon. Thus I concur in the holding that there was a general inventory search, unwarranted under the circumstances, and that the superior court erred in denying Zehrung's motion to suppress. At the same time, I wish to emphasize my strong belief that jail personnel are entitled to make an immediate and thorough search for weapons, or any item that could be used as a weapon, whenever a prisoner is delivered into their custody.

Although the majority does not pass on the issue, I further believe that there can be some limitation on the right to "immediate release" after posting bail. Specifically, I would hold that detention for such time as may be reasonably necessary to allow the authorities to fingerprint and photograph the accused is allowable. Otherwise, there may be no record from which his identity can later be determined with certainty.

dy. However, as to the permissible extent and limitations on the scope of such a warrantless search, see People v. Brisendine, 13 Cal.3d 528, 119 Cal.Rptr. 315, 323–325, 531 P.2d 1099, 1107–09 (1975). See also, People v. Collins, 1 Cal.3d 658, 83 Cal.Rptr. 179, 182–184, 463 P.2d 403, 406–08 (1970).

**40.** It was not necessary for Officer Ellington to search Zehrung's wallet to ascertain his identity because Ellington already knew Zehrung.

**41.** This was the approach adopted by the Supreme Court of Hawaii in State v. Kaluna, 520 P.2d 51, 61–62 (Haw.1974).