**Terry L. GRAY, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–2875.**

Court of Appeals of Alaska.

Sept. 14, 1990.

Karen Hegyi, Asst. Public Defender, Palmer, and John B. Salemi, Public Defender, Anchorage, for appellant.

John A. Scukanec, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Douglas B. Baily, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., COATS, and ANDREWS,* District Court Judge.

## OPINION

BRYNER, Chief Judge.

Terry L. Gray was convicted after pleading no contest to a charge of misconduct involving a controlled substance in the fourth degree (possession of cocaine). Gray reserved the right to appeal the superior court's denial of his motion to suppress evidence. On appeal he contends that the evidence against him should have been suppressed because it resulted from a jail-house search that occurred before he was allowed a reasonable opportunity to post bail. We reverse.

The pertinent facts are undisputed. On February 11, 1988, Palmer Police Officer Michael Lamb stopped a car in which Gray rode as a passenger. Lamb subsequently arrested Gray on an outstanding misdemeanor warrant for contempt of court. Bail on the warrant had already been set at $500. Lamb frisked Gray for weapons and transported him to the Matanuska Pretrial Correctional Facility (Matsu Pretrial). A search of Gray's person at Matsu Pretrial disclosed a small packet of cocaine.

---

* Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

After being charged with possession of cocaine, Gray moved to suppress the evidence against him, arguing that the search at Matsu Pretrial violated the requirements of *Zehrung v. State*, 569 P.2d 189 (Alaska 1977), *modified in part on rehearing*, 573 P.2d 858 (1978). At the evidentiary hearing on the motion to suppress, the state called Michael Lamb, the arresting officer. Lamb testified that upon arrival with Gray at Matsu Pretrial, he placed Gray into the custody of William McCumbsky, a correctional officer. McCumbsky asked Gray if he had money for bail. Gray said that he hoped a friend was bringing it.

According to Lamb, immediately after this conversation, McCumbsky began a search of Gray, removing all articles from his pockets. Although Lamb had focused his immediate attention on filling out a remand slip, he was able to provide the following description of the search:

> I don't know what they consider it, it's just a normal, it would probably be an inventory search. They just take everything out of his pockets and putting it up there and all I heard was what is this? And as soon as I heard that, I looked over and I observed a white packet with a regular clear plastic bag with white substance. And as soon as he said that, Mr. Gray stated that's not mine, I don't know how that got there, I don't know what it is.

Lamb field-tested the substance in the bag; the test indicated the presence of cocaine.

The only other witness called by the state at the suppression hearing was Ernest Griffiths, an assistant correctional superintendent at Matsu Pretrial. Griffiths was not present during Gray's search and had no personal knowledge of the circumstances. He was called solely for the purpose of establishing institutional policy for handling persons who had been arrested on minor offenses for which bail had already been established.

Griffiths confirmed that the type of search to which Gray had been subjected, as described by Lamb, was routine procedure. According to Griffiths, persons arrested for minor offenses with bail already established were allowed approximately an hour after arrival at Matsu Pretrial to make arrangements for bail. Immediately upon arrival at Matsu Pretrial, however, arrestees were subjected to a search, which Griffiths described as a "patdown." Arrestees were required to empty all articles from their clothing and were frisked to make sure that all articles had been removed. The articles were then inventoried and placed into a property bag. Arrestees were then placed in one of two holding cells located immediately adjacent to the booking area, outside the area of the institution that houses prisoners who have already been booked.

On some occasions, however, when the holding cells were being used to house juveniles or female prisoners, newly arrived arrestees would be kept handcuffed on a bench in the booking area while waiting for bail to be arranged.

Griffiths further testified that if an arrestee managed to post bail within the allotted hour and was released, the articles removed in the initial "patdown" were returned, except for contraband. When an arrestee could not post bail, all articles taken from the arrestee's person would be stored in a property box in the control room, the arrestee would be subjected to a full strip search and would then be moved into the correctional facility proper.

Gray also testified briefly in his own behalf at the suppression hearing. He described the search in the following terms:

> I was wearing a Carhart jacket and the booking officer or what—jailer, whatever, just kinda swished by my side and came up with it. I don't know.

Following the suppression hearing, Gray argued that the Department of Corrections' policy, as it was applied in his case, violated the requirements of *Zehrung*. That case held, in relevant part:

> [W]hen one is arrested and brought to a jail for a minor offense for which bail has already been set in a bail schedule, he should be allowed a reasonable opportunity to attempt to raise bail before being subjected to the remand and book-

ing procedures and the incident inventory search.

569 P.2d at 195.

In opposition to Gray, the state characterized the institutional policy described by Officer Griffiths as a limited "patdown" that was permissible under *Zehrung* and that was both reasonable and necessary to protect against the introduction of weapons and contraband into correctional facilities.

Superior Court Judge J. Justin Ripley denied Gray's motion to suppress. Although Judge Ripley was troubled that the institutional policy which Griffiths had described accorded little significance to the *Zehrung* rule, he nevertheless found the procedure necessary to protect against the introduction of weapons and contraband into correctional facilities. Noting that Gray's own testimony suggested that the actual intrusiveness of the search that he had been subjected to was minimal, Judge Ripley found it to be permissible.

On appeal, the parties renew the arguments that they advanced below. We must accordingly decide whether the warrantless search in Gray's case was permissible in light of *Zehrung*. We begin our analysis where *Zehrung* began:

> A search conducted without a warrant is per se unreasonable unless the search fits within one of the "few specifically established and well-delineated exceptions" to the warrant requirement. The burden of proof is on the state to prove by a preponderance of the evidence that the exigencies of the situation make conduct of the search without a warrant imperative.

*Id.* at 192 (footnotes omitted).

In *Zehrung*, the defendant was arrested on outstanding misdemeanor and failure to appear warrants for which bail had been preset. The arresting officer drove Zehrung to the Anchorage jail and turned him over to correctional officers, who immediately removed and inventoried all articles on Zehrung's person. In the course of the inventory, the officers looked through Zehrung's wallet and discovered credit cards belonging to another individual. The cards later linked Zehrung to a recently committed rape.

After being charged with rape, Zehrung moved to suppress the fruits of the warrantless search. The state sought to justify it by invoking two exceptions to the warrant requirement: the pre-incarceration inventory exception and the search incident to arrest exception. Zehrung argued, however, that because he had been arrested for a minor misdemeanor on which bail had already been set, he should have been allowed an opportunity to post bail before being subjected to an inventory search. Zehrung further argued that the exception for searches incident to arrest was inapplicable because the articles that were seized from him were not weapons and no evidence of the crimes for which he had been arrested could conceivably have been concealed on his person.

The supreme court found these arguments to be persuasive. The court focused initially on the preincarceration inventory exception. Noting that the traditional justification for inventory searches was "to prevent the entry of money, contraband and weapons into the jail, to protect the arrestee's property, and to protect the jail against arrestee claims for lost or damaged property ..." *id.* at at 193 n. 10, the court observed: "[B]ecause the justifications for a preincarceration inventory do not exist if the arrestee is not to be incarcerated, no inventory search can be conducted in such cases." *Id.* at 193 (footnotes omitted).

> On this basis, the court stated:
> The current practice at the jail is to conduct an inventory search of all arrestees, whether or not a particular arrestee is capable of posting bail at the time he or she arrives at the jail. Nevertheless, we hold that a warrantless jailhouse inventory is without justification when an arrestee is not going to be incarcerated, and it is therefore constitutionally impermissible.

*Id.*

The court went on to conclude that when a person is arrested on a minor charge for which bail has been set but does not immediately have the money to secure release, a

reasonable opportunity must be allowed the arrestee to make arrangements for bail before commencement of the formal booking and pre-incarceration inventory process:

> The ability to obtain ... prompt release should not depend on the fortuitous circumstance of one having sufficient money on his person to post the bail at the time he arrives at the jail. Many people do not carry much cash on their person. Those persons should be permitted access to a telephone in order to get in touch with a relative, an employer, a friend, or an attorney, who would come to the stationhouse within a reasonable time and put up the necessary bail.

*Id.* at 195.

In the present case, established procedures at Matsu Pretrial, as applied in Gray's case, are virtually indistinguishable from those considered by the supreme court in *Zehrung*. Immediately upon arrival, all articles were removed from Gray's person and were to be inventoried and placed into a bag for safekeeping. Had contraband not been found, Gray would have been placed into an adjacent holding cell pending arrangements for release on bail.

The sole distinction between the procedure applied to *Gray* and that considered in *Zehrung* seems to be that, under current procedure, the contents of articles such as wallets might not immediately be scrutinized and inventoried—that process, and a full strip search, apparently being left until after passage of the time allotted for posting bail.

The state relies in part on this distinction, characterizing the immediate removal of articles from Gray's person at the jail as an "initial patdown" search that is justified under the circumstances. In particular, the state notes that Judge Ripley, relying on Gray's own description of the removal of the packet from his pocket, found the search to have been "minimally intrusive." The state argues that this finding is not clearly erroneous.

These arguments are unpersuasive. The uncontroverted evidence, including Gray's own testimony, establishes that the evidence in this case was removed by a correctional officer from inside Gray's clothing. The search occurred immediately upon Gray's arrival at Matsu Pretrial and before he was allowed any opportunity to arrange for bail. This treatment was in keeping with institutional policy, which called for routine removal and inventory of all articles from the person of all arrested individuals, immediately upon their arrival.

 Whatever right correctional officers might have, under *Zehrung*, to conduct immediate "patdown" searches for weapons in cases such as Gray's, that right certainly does not extend to the type of search involved here. A "patdown" is just that—a limited, external probing of clothing or articles for signs of possible weapons. *See generally* 3 W. LaFave, *Search and Seizure* § 9.4(b) (1987). Ordinarily, the permissible scope of a "patdown" is exceeded when the search extends beyond the exterior of a person's clothing or possessions and intrudes into pockets and closed containers. As held in the seminal case of *Sibron v. New York,* 392 U.S. 40, 65, 88 S.Ct. 1889, 1904, 20 L.Ed.2d 917 (1968), in an ordinary patdown, intrusion beyond the outer clothing of a suspect is allowed only if the initial exploration discloses potential weapons. *See also* W. LaFave, *supra* § 9.4(c).

Clearly, the routine emptying of an arrestee's pockets such as occurred in the present case cannot be justified merely by labeling the procedure a "patdown." The search conducted in this case was just that—a search; the state's attempt to characterize it as a "patdown" is without merit.

 The state's further argument that the policy of routinely removing all articles from arrestees is necessary to protect against the introduction of weapons and contraband into correctional facilities is equally untenable. As a practical matter, the argument based on necessity, which the trial court found persuasive, may have much to recommend it. *Zehrung*, however, considered and rejected the same argument not once, but twice.

In its original opinion in *Zehrung*, the Alaska Supreme Court, rejecting precisely the same argument that the state advances here said:

> Jail officials contend that, if the person arrested is not promptly searched, security problems would be caused at the jail. But this argument is not persuasive. First of all, the offenses that are immediately bailable are minor in nature. Secondly, a warrantless search for weapons is permissible.... And third, jail officials at the Anchorage jail regularly place persons under arrest into an unsecured holding cell before they are even remanded to custody, at which point the preliminary search is conducted.

569 P.2d at 195.

After the court issued its initial decision in *Zehrung*, the state petitioned for rehearing, arguing that, even if the court's decision could be implemented in Anchorage and other larger cities in the state, it would lead to insurmountable security problems in remote locations. On rehearing, the supreme court acknowledged the potential for problems in isolated locations but declined to modify the *Zehrung* rule. Instead, the court required that the state justify specific exceptions to *Zehrung* on a case-by-case basis:

> It may well be that exigencies may arise warranting a more thorough search for contraband under unusual circumstances. It is impossible to rule on the myriad of conceivable circumstances. The rule set forth in our original opinion in *Zehrung* should normally be followed unless exigencies demand a different course of action. Whether circumstances justify a variance will depend on the particular facts involved and must be determined in an adversary proceeding on a case-by-case basis.

*Zehrung v. State*, 573 P.2d 858, 859 (Alaska 1978).

In the present case, as in *Zehrung*, the immediate search to which Gray was subjected upon arriving at the correctional facility was the result of institutional policy rather than individualized exigency. Far from attempting to make a case-specific showing of exigency, the state did not even present testimony from any correctional officer who was familiar with the circumstances in Gray's case. The only corrections official to testify described existing policy, which appears not to have changed significantly since *Zehrung* was decided.

The record in this case establishes that Matsu Pretrial was equipped with holding cells adjacent to the booking area, outside the dormitory area of the facility. While the record indicates that those cells were occasionally required to house female prisoners or juveniles, there is nothing in the record to indicate that this exigency existed when Gray was brought to Matsu Pretrial. Moreover, the record indicates that, even when the holding cells are occupied, newly arrived prisoners are not commingled with the occupants of the cells but are kept handcuffed on a bench in the booking area pending arrangements for bail.

██ In short, absent an individualized showing of exigency, *Zehrung* precludes inventory searches of persons arrested for minor offenses for which bail has been set until they are given a reasonable opportunity to post bail. Here, the procedure to which Gray was subjected amounted to a search and not a limited "patdown." No case-specific showing of exigency was made. The state therefore failed to meet its burden of showing that Gray's warrantless search fell within the preincarceration inventory exception to the warrant requirement.[1]

1. The state mistakenly relies on *Reeves v. State*, 599 P.2d 727, 735–36 (Alaska 1979), for the contention that, even under *Zehrung*, a routine emptying of pockets and an ensuing patdown is justifiable as part of an "initial remand and booking process." The state attempts to distinguish this "initial" process from the full preincarceration inventory addressed in *Zehrung*. In *Reeves*, as in the present case, the defendant was arrested on a minor charge for which bail had already been set. Upon arrival at the jail, he was required to empty his pockets and was subjected to a patdown, which disclosed contraband. The supreme court upheld the search in *Reeves*. In so doing, it held only that the search did not exceed the scope of a valid preincarceration inventory search. The court expressly noted, however, that the search had occurred be-

The second rationale considered in *Zehrung* and arguably applicable to uphold the warrantless search in the present case is the search incident to arrest exception to the warrant requirement. In deciding *Zehrung*, the supreme court held that in cases involving arrests for minor crimes, where no evidence of the crime could reasonably be expected to be found, the search incident to arrest exception would not justify a search for evidence:

> [W]e hold that, absent specific articulable facts justifying the intrusion ..., a warrantless search incident to an arrest, other than for weapons, is unreasonable and therefore violative of the Alaska Constitution if the charge on which the arrest is made is not one, evidence of which could be concealed on the person.

*Zehrung*, 569 P.2d at 199–200 (footnote omitted). The *Zehrung* court nevertheless emphasized that, even in such cases, a search incident to arrest for weapons is allowed. With regard to the permissible scope of a weapons search, however, *Zehrung* expressly adopted the standard enunciated by the California Supreme Court in *People v. Brisendine*, 13 Cal.3d 528, 119 Cal.Rptr. 315, 531 P.2d 1099, 1107–09 (1975). *See Zehrung*, 569 P.2d at 199 n. 39.[2]

The California Supreme Court's decision in *Brisendine*, in turn, relied on a line of California cases dealing with offenders detained for minor offenses "who may or must be taken before a magistrate and given the option to post bond." *Brisendine*, 119 Cal.Rptr. at 319, 531 P.2d at 1103. The court in *Brisendine* noted that in such cases "a 'patdown' or limited search

for weapons is permissible." *Id.* 119 Cal. Rptr. at 320, 531 P.2d at 1104. The court cautioned, however, that "[i]n the ordinary *Terry*-type pat-down ... an intrusion further than the outer clothing of the suspect is allowable only if the initial limited exploration discloses potential instruments of assault." *Id.* 119 Cal.Rptr. at 323, 531 P.2d at 1107 (citation omitted). *Brisendine* then went on to hold:

> To properly exceed the scope of a pat-down the officer must be able to point to 'specific and articulable facts reasonably supporting his suspicion' that the suspect is armed. The burden of establishing these facts rests with the People.

*Id.* 119 Cal.Rptr. at 323–24, 531 P.2d at 1107–08 (citations omitted).

In expressly adopting the *Brisendine* standard, the court in *Zehrung* made clear its intention to limit the permissible scope of searches incident to arrest for weapons in cases involving persons arrested for minor bailable offenses. *See Jackson v. State*, 791 P.2d 1023, 1026 (Alaska App.1990). In the present case, when Gray was brought to Matsu Pretrial, he had already been subjected to a patdown search for weapons in the field by Officer Lamb. Nevertheless, we believe it clear that, under *Zehrung*, corrections officers had the right to conduct an immediate additional search of similar scope—that is, a limited patdown for weapons. Beyond that, however, *Zehrung* precluded any further intrusion unless officers were "able to point to 'specific and articulable facts reasonably supporting [the] suspicion' that" Gray was armed. *See Brisendine*, 531 P.2d at 1107.[3]

---

fore *Zehrung*. The defendant had not raised the *Zehrung* issue, but had argued only that the search had exceeded the scope of an inventory search. On this basis, the court in *Reeves* expressly found it unnecessary to decide whether *Zehrung* should be applied retroactively in *Reeves*. *Reeves*, 599 P.2d at 731.

 Under the circumstances, *Reeves* fails to support the state's contention that the supreme court has recognized and approved an intermediate, "initial" inventory procedure. Indeed, in expressly finding it unnecessary to decide whether *Zehrung* should apply retroactively to cases such as *Reeves*, the court plainly recognized that the procedure followed in that case

amounted to an inventory search and would not have been justified under *Zehrung*.

2. Thus, in footnote 39, the *Zehrung* court said, in relevant part:

 A warrantless search for weapons is permissible when one is arrested and taken into custody. However, as to the permissible extent and limitations on the scope of such a warrantless search, *see People v. Brisendine*, 13 Cal.3d 528, 119 Cal.Rptr. 315, 323–25, 531 P.2d 1099, 1107–09 (1975).

3. Notably, in the initial *Zehrung* opinion, Justice Burke would have gone beyond the position of

No such facts have been presented here. As we have already noted, the state did not call the correctional officer who searched Gray to testify at the suppression hearing. The testimony of Officer Lamb and of Gray himself establishes that the disputed evidence was removed from Gray's pocket. The testimony of both Lamb and Griffiths indicates that the routine search conformed with existing institutional policy. There is nothing to suggest that the correctional officer who conducted the search had any reason to suspect that Gray was armed or that the clear plastic packet was a weapon. In fact, there is nothing to establish that the officer even conducted a patdown and felt the packet before reaching into Gray's clothing and removing the packet from his pocket.

Under the circumstances, the state failed to meet its burden of establishing that the disputed evidence was seized in the course of a lawfully conducted search incident to arrest. No other exceptions to the warrant requirement having been argued or being apparent, we must conclude that the superior court erred in denying Gray's motion to suppress.

The judgment is REVERSED.

the majority of the court by allowing a full search for weapons of all arrestees upon arrival at the jail. In his separate concurrence, Justice Burke said, in relevant part:

I wish to emphasize my strong belief that jail personnel are entitled to make an immediate and thorough search for weapons or any item that could be used as a weapon, whenever a prisoner is delivered into their custody.

569 P.2d at 200. On rehearing, in *Zehrung*, Justice Burke altered his position even further from that of the majority, indicating his disapproval of the original *Zehrung* result. *See Zehrung*, 573 P.2d at 859. At the present time, only two members of the original *Zehrung* court remain on the supreme court, Justice Burke and Justice Rabinowitz. Given the passage of time and the change in composition of the court, perhaps reevaluation of *Zehrung* is due. *See, e.g., Jackson v. State,* 791 P.2d 1023, 1029–30 (Bryner, C.J., concurring), 791 P.2d at 1030–31 (Singleton, J., dissenting). Reassessment of *Zehrung*, however, would clearly be a task for the supreme court, rather than for this court.