Opinion by Judge IKUTA; Concurrence by Judge GOODWIN; Dissent by Judge BERZON.
OPINION
IKUTA, Circuit Judge:
This appeal requires us to determine whether the California Court of Appeal unreasonably applied “clearly established Federal law, as determined by the Supreme Court,” 28 U.S.C. § 2254(d)(1), when it denied Antwion Thompson’s motion to suppress his multiple confessions to the murder of his girlfriend. To resolve this issue, we must first determine whether we measure the state court’s opinion against Oregon v. Elstad, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), which was decided before the California Court of Appeal issued its opinion, or Missouri v. Seibert, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), which was decided after that date. In light of the Court’s recent decision in Greene v. Fisher, — U.S. -, 132 S.Ct. 38, 181 L.Ed.2d 336 (2011), which unanimously held that clearly established law must be assessed as of the time of the final state court adjudication on the merits, id. at 44, we hold that Elstad is the relevant Supreme Court precedent. Because the California Court of Appeal reasonably applied Elstad in holding that Thompson’s confessions were admissible, we affirm the district court’s denial of Thompson’s habeas petition.
I
We begin with the facts found by the California Court of Appeal, which are pre *1092 sumed to be correct. See 28 U.S.C. § 2254(e)(1).
In June 1998, appellant Thompson was 18 years old and lived with his father, Edward Thompson, in Bay point; the victim, Arie Bivins, was 17 years old and lived with her parents in Pittsburg. Thompson and Bivins were boyfriend and girlfriend. They had begun dating in 1997. Their relationship had deteriorated by spring 1998; Bivins wanted to break up with Thompson, who was jealous and controlling. On June 21, 1998, Thompson eavesdropped as Bivins told a friend that she was interested in another guy.
At approximately 1:30 p.m. on June 22, 1998, Edward Thompson saw appellant Thompson and Bivins talking in Bivins’s car outside Thompson’s home. Appellant Thompson subsequently came inside and then left again around 2:00 p.m. without saying where he was going. At about 4:00 p.m., Thompson returned home and convinced his father to drive him to Bivins’s house, explaining that he was concerned about Bivins because he had been unable to reach her by telephone. When appellant and his father arrived at Bivins’s house, appellant approached the front door and his father waited in the car. Edward Thompson saw appellant knock, open the front door, and then become wildly upset. Edward Thompson approached and saw Bivins on the floor by the front door with a hole in her chest and cuts on her chest and neck. He went to a neighbor’s house and called 911. Paramedics subsequently confirmed that Bivins was dead. The cause of death was a stab wound to the chest.
When Pittsburg police officer Carl Webb arrived at Bivins’s house at 4:22 p.m. on June 22, 1998, he observed Thompson in the driveway jumping up and down, running around, and flailing his arms. Officer Eric Solzman arrived at the scene and Webb told him to “hang on” to Thompson because they needed to talk to him. Solzman approached Thompson, who told Solzman that he did not feel well. Solzman asked Thompson whether he wanted to lie in the back of Solzman’s patrol car, because it was a warm day and the car was air conditioned, and Thompson agreed. Thompson never asked to get out of the patrol car, and Solzman never told Thompson he had to stay. Although Thompson was not free to leave in Solzman’s mind, he never conveyed that to Thompson.
Pittsburg police homicide inspector John Conaty arrived at the scene at about 4:45 p.m. Thompson was in Solz-man’s car and appeared to be sleeping. Conaty talked to Edward Thompson, who told him about driving his son to the house and discovering the body. Conaty and his partner, Inspector Giaco-melli, then approached appellant Thompson, who appeared to be waking up when they opened the door. Thompson said he was “okay” and stepped out of the car to talk to the inspectors. Conaty asked Thompson if he would be willing to go to the police station to talk about the circumstances of finding Bivins’s body. Thompson said he just wanted to go home and sleep. Thompson agreed to go to the station after Conaty explained that his assistance could be critical to the investigation.
Solzman took Thompson to the police station at about 5:30 p.m. He never handcuffed or pat-searched Thompson. He put Thompson in the station’s break room, which had a couch and a television. He asked Thompson if he needed food or water. He told Thompson to relax and that he could watch television; Thompson laid down on the couch and started to watch television. Solzman told Thompson he would be outside if Thompson needed anything or had any *1093 questions. Solzman sat at a desk in the hallway to write a report; he could see Thompson in the break room through the open door. Thompson was not handcuffed; he never asked to leave, never said he was cold, and never asked for food or water. Solzman never told him he was not free to leave. Thompson slept most of the time until the inspectors arrived for him, about five and a half hours later.
Inspectors Conaty and Giacomelli approached Thompson in the station break room at about 11:00 or 11:30 p.m. Thompson said he was feeling “okay.” Conaty apologized for keeping Thompson waiting and asked if they could talk to him down the hall; Thompson agreed. Thompson did not indicate that he wanted to leave, that he did not want to talk to them, or that he wanted to talk to his father. Thompson was not handcuffed, and both inspectors were wearing suits and did not have guns. The inspectors took Thompson to a small interview room with three chairs. The door was closed but not locked. When Thompson said that the room was cold, Conaty turned on the heater.
The questioning, which was videotaped, lasted about two hours. At the outset, Thompson complained of a headache. Inspector Conaty asked Thompson, “Do you feel like doing'—can we do this now or would you rather do this another time? ... You can go if you don’t want to do it now.” Thompson replied, “We can go through it.” The inspectors then questioned Thompson for an extended period without providing Miranda warnings. Over the course of the questioning, Thompson admitted that he had been at Bivins’s house immediately before he asked his father to take him there and that he had stabbed Bivins by accident during an argument when Bivins came at him while he was holding a knife. Subsequently, the inspectors informed Thompson of his Miranda rights. Thompson then repeated his earlier admissions.
At about 2:00 a.m., Thompson led the inspectors to locations where he had disposed of the knife and burned his clothes. Thompson also agreed to participate in a videotaped reenactment of Bivins’s death. The reenactment commenced at about 12:47 p.m. on June 23, 1998.
Thompson was charged with murder, mayhem, and personal deadly weapon use in violation of California Penal Code §§ 187, 203, and 12022(b)(1).[1] The state trial court granted in part and denied in part Thompson’s motion to suppress the statements he provided police on June 22 and June 23, 1998. The court determined that Thompson was not in custody at the outset of the interrogation, but that the interrogation became custodial sometime after Thompson admitted to visiting Bivins’s house alone but before he admitted to finding her there alive. The trial court suppressed all statements made after the interrogation became custodial and before Miranda warnings were administered. The video of Thompson’s post -Miranda confession was shown to the jury, along with the videotaped reenactment of the crime. Thompson was convicted on all charges and sentenced to twenty-six years to life.
The California Court of Appeal affirmed the trial court’s ruling on the suppression motion on February 3, 2004. Relying mainly on the Supreme Court’s decision in Elstad, the court held that Thompson’s *1094 post-Miranda statements were admissible because there was no improper police coercion during the period of unwarned questioning, and Thompson’s subsequent Miranda waiver was knowingly and voluntarily made. Thompson argued that Elstad was distinguishable because the officers in his ease deliberately delayed Miranda warnings until after he had confessed. For support, Thompson pointed to Missouri v. Seibert, 93 S.W.3d 700 (Mo.2002), which was then pending before the Supreme Court. The state court recognized that the Supreme Court “may clarify or expand upon the Elstad ... decision ] in one or more eases currently before it,” including Seibert, but held that “at present, we are bound by Elstad.” The California Supreme Court summarily denied review on April 21, 2004.
On June 28, 2004, the Supreme Court issued its opinion in Seibert. Although there was no majority opinion, five justices agreed that when officers use a deliberate two-step interrogation process whereby they withhold Miranda warnings until after the suspect has confessed, postwarning statements related to the substance of the prewarning statements must be excluded unless the midstream Miranda warnings would apprise a reasonable person in the suspect’s shoes of his rights. Seibert, 542 U.S. at 621-22, 124 S.Ct. 2601 (Kennedy, J., concurring); see also United States v. Williams, 435 F.3d 1148, 1157-58 (9th Cir.2006) (holding that Justice Kennedy’s concurrence represents the holding of the Court). Under Seibert, Elstad remains good law and continues to govern the admissibility of postwarning statements “unless the deliberate two-step strategy was employed.” Seibert, 542 U.S. at 622, 124 S.Ct. 2601 (Kennedy, J., concurring); see also id. at 620, 124 S.Ct. 2601 (‘‘Elstad was correct in its reasoning and its result.”); Williams, 435 F.3d at 1158.
Despite the Court’s issuance of Seibert in June 2004, Thompson did not seek cer-tiorari in the Supreme Court, nor did he file a state habeas petition. His conviction thus became final on July 20, 2004.
The following year, Thompson filed a habeas petition in federal district court, arguing, among other things, that his post-Miranda statements should have been excluded under Seibert. The state pointed out that Seibert was decided after the state appellate court rejected Thompson’s claims on direct appeal and argued that, because the applicability of Seibert was not fairly presented to the state court, Thompson’s claim was not properly exhausted under 28 U.S.C. § 2254(b) or (c).
The district court declined to reach the exhaustion issue, instead holding that Sei-bert was distinguishable on the merits because Thompson had not “presented] any evidence in support of his assertion that the inspectors in this case deliberately withheld their Miranda advisement until [Thompson] had incriminated himself.” Applying AEDPA deference, the district court held that the state appellate court’s determination that Thompson made a valid, voluntary waiver of his Miranda, rights was a reasonable application of Elstad.
Thompson timely appealed, arguing, among other things, that the state appellate court’s rejection of his claim (that his post -Miranda statements should have been suppressed) was contrary to clearly established Supreme Court precedent. According to Thompson, Seibert was the relevant “clearly established Federal law, as determined by the Supreme Court of the United States,” § 2254(d)(1), because the Supreme Court issued the decision before his case became final on direct review.
A divided Ninth Circuit panel reversed. Thompson v. Runnel, 621 F.3d 1007 (9th Cir.2010) (Thompson I), withdrawn and superseded by 657 F.3d 784 (9th Cir.2011) *1095 (:Thompson II). The majority first determined that Thompson had sufficiently exhausted his challenge under Seibert because, in his petition for review to the California Supreme Court, Thompson fairly presented the substance of his Seibert claim. Thompson II, 657 F.3d at 794-96. Turning to the requirements of AEDPA, the majority noted that there was “some uncertainty” as to whether Seibert was “clearly established Federal law” within the meaning of 28 U.S.C. § 2254(d)(1) given that it was decided after the California Supreme Court denied review but before Thompson’s conviction became final, but declined to “address the merits of this procedural question” because the state did not specifically raise it. Id. at 796 n. 7. The majority then held that the state appellate court’s reliance on Elstad, without consideration of the rule announced several months later in Seibert, was “contrary to ... clearly established Federal law” under § 2254(d)(1). Id. at 797. Relieved of AEDPA deference and reviewing de novo, the majority held that there was a Seibert violation because “the only reasonable inference ... [was] that the officers deliberately withheld Miranda warnings until after obtaining a confession,” id. at 799, and the delayed Miranda warnings were ineffective in apprising Thompson of his rights, id. at 799-802. The majority therefore granted the writ. Id. at 802. The dissent would have held that Seibert was not clearly established law for purposes of § 2254(d)(1) because it was decided after the last reasoned state court decision on the merits, and would have affirmed the district court. Id. at 804 (Ikuta, J., dissenting).
The state filed a petition for rehearing and rehearing en banc which, among other things, took issue with the majority’s determination that the state had waived the argument that Seibert was not clearly established law. Citing Eze v. Senkowski, 321 F.3d 110, 121 (2d Cir.2003), the state also argued that AEDPA’s “clearly established law” requirement is not a “procedural defense but [a] standard of general applicability” and therefore cannot be waived by the state. In a published order, the Ninth Circuit denied rehearing and rehearing en banc. Thompson II, 657 F.3d at 784. Seven judges dissented from the denial of rehearing en banc. Id.
The state petitioned the Supreme Court for certiorari, arguing that the California Court of Appeal had faithfully applied El-stad, which was the clearly established Supreme Court precedent at the time of its decision, and that the Ninth Circuit panel majority erred in assessing “clearly established Federal law” at the time Thompson’s conviction became final, instead of at the time of the state court decision. See Brief for Petitioner at 12, McEwen v. Thompson, — U.S.-, 132 S.Ct. 578, 181 L.Ed.2d 418 (2011) (No. 11-305), 2011 WL 3978775, at *12.
While the certiorari petition was pending, the Supreme Court decided Greene. In Greene, a habeas petitioner claimed he was entitled to relief under a Supreme Court decision issued while his post-conviction review petition to the state supreme court was pending. 132 S.Ct. at 43-44. In rejecting this argument, the Court unanimously held that “clearly established Federal law” does not include the decisions of the Supreme Court “that are announced after the last adjudication of the merits in state court but before the defendant’s conviction becomes final.” Id. at 42. For purposes of § 2254(d)(1), therefore, “clearly established Federal law” refers to the holdings of the Supreme Court “as of the time the state court renders its decision.” Id. at 44 (internal quotation marks omitted). Greene thus resolved the timing issue raised by the state in its petition for certiorari in Thompson II.
*1096 On November 14, 2011, the Supreme Court granted the state’s petition for cer-tiorari, vacated the judgment in Thompson II, and remanded the case to the Ninth Circuit “for further consideration in light of [Greene ].” McEwen v. Thompson, — U.S.-, 132 S.Ct. 578, 181 L.Ed.2d 418 (2011). We requested supplemental briefing and reargument in light of the Supreme Court’s decision. The state argued that, in light of Greene, we must now consider whether the state appellate court’s analysis of Thompson’s Miranda claim was a reasonable application of El-stad. Thompson argued that the state waived or forfeited that argument, and that, in any event, he was entitled to relief even under Elstad.
II
Thompson seeks relief on the ground that his Fifth Amendment rights were violated by the state trial court’s admission of his post-Miranda statements, and argues that we are not precluded from granting relief under AEDPA because the state appellate court’s rejection of this claim was an unreasonable application of clearly established Supreme Court precedent. 28 U.S.C. § 2254(d)(1). As directed by the Supreme Court, we must now reconsider Thompson’s claim for federal habeas relief in light of Greene.
We look to the last reasoned state court adjudication on the merits of Thompson’s Miranda claim, which was the decision of the California Court of Appeal on February 3, 2004. See Greene, 132 S.Ct. at 44-45. Greene has now confirmed that at the time the state court rendered its decision, the clearly established Supreme Court precedent was Elstad, because Seibert had not yet been decided. Id. at 44. Under § 2254(d)(1) and binding Supreme Court precedent, we cannot grant habeas relief unless the state court’s adjudication of Thompson’s Miranda claim was an “unreasonable application” of Elstad. See id. at 44 (2011) (“As we explained, § 2254(d)(1) requires federal courts to ‘focu[s] on what a state court knew and did,’ and to measure state-court decisions ‘against this Court’s precedents as of ‘the time the state court renders its decision.’ ’ ” (quoting Cullen v. Pinholster, — U.S. -, 131 S.Ct. 1388, 1399, 179 L.Ed.2d 557 (2011))).
In light of this conclusion, we must determine whether the state appellate court’s decision was “contrary to, or an unreasonable application of’ Elstad. In Elstad, a defendant made incriminating statements before receiving Miranda warnings, and attempted to suppress his post -Miranda confession on the ground that the unwarned statements “let the cat out of the bag” and therefore induced the post-warning confession. Elstad, 470 U.S. at 302, 105 S.Ct. 1285. The Supreme Court rejected the defendant’s argument, holding that while “the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.” Id. at 309, 105 S.Ct. 1285.
Here, the California Court of Appeal’s determination that Thompson’s post-Miranda confessions were admissible was not contrary to or an unreasonable application of Elstad. The state court correctly explained that, under Elstad, “so long as the earlier [unwarned] statement was not involuntary due to police coercion, the subsequent voluntary, warned statement is admissible.” Applying this standard, the court concluded that “there was no improper police coercion during the period of unwarned questioning and that Thompson’s statements during that period were voluntary.” The court emphasized that “the overall environment was relatively unintimidating and nonoppressive,” and that *1097 “the inspectors did not make promises or threats and the overall tenor of questioning was not coercive.” The court then concluded that Thompson’s subsequent Miranda waiver was knowing and voluntary:
Although young, Thompson was not a minor in June 1998, and the fact that he may have a learning disability does not indicate that he was unable to understand his rights. As the trial court concluded, the videotape shows that Inspector Conaty properly informed Thompson of the Miranda rights and that Thompson indicated that he understood those rights with a nod of his head. The videotape indicates that the inspectors were careful, polite, and soft-spoken, not overbearing. Nothing on the videotape indicates that Thompson did not understand his rights or was reluctant to speak to the inspectors.
The court also held that admission of the videotaped reenactment was also proper: “Although Thompson spent a cold and uncomfortable night in the county jail following the interrogation, he was fed and again advised of his Miranda rights before doing the interrogation.” The court concluded there was no “indication of coercion surrounding the reenactment.”
Thompson argues that the state court unreasonably applied Elstad because the officers’ interrogation tactics, including use of “implied promises of leniency and misrepresentations” rendered his post-Miranda statements involuntary. The state court was not unreasonable in rejecting this argument. Police interrogation tactics that do not rise to the level of coercion do not make a confession involuntary. See Illinois v. Perkins, 496 U.S. 292, 297, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990) (“Ploys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within Miranda’s concerns.”). The state court could reasonably have concluded that the officers’ tactics did not rise to that level. As the court correctly noted, “the inspectors never promised, either expressly or impliedly, any specific benefits that would flow to Thompson if he confessed,” and “the general thrust of the inspectors’ statements was that it would be better for Thompson if he told the truth and that his punishment would depend on the particular circumstances of the killing” and the judgment of the District Attorney. Although Thompson argues that he was more susceptible to the officers’ tactics because he was only eighteen and had a learning disability, the state court reasonably concluded that “the record does not reveal such youthfulness and low intelligence that Thompson would have been unusually vulnerable to the inspectors’ tactics.”
Finally, Thompson claims that the state court erred in rejecting his Elstad claim because his Miranda waivers were not knowing and voluntary. Again, the state court’s rejection of this argument was not an unreasonable application of Elstad, given that the officers fully advised Thompson of his rights before he reiterated his confession on June 22, 1998, and again before he participated in the videotaped reenactment of the murder on the following day, and Thompson affirmed that he fully understood his rights.
Because we conclude that the state court’s decision affirming the trial court’s denial of Thompson’s motion to suppress the post-Miranda statements was not contrary to or an unreasonable application of Elstad, AEDPA precludes relief.
Ill
Notwithstanding this clear precedent, Thompson argues that we should not consider whether the state court’s decision was an unreasonable application of Elstad. *1098 The state, he argues, waived or forfeited the argument that only Elstad was “clearly established Federal law” for purposes of § 2254(d)(1) by failing to raise it in its briefs to the district court and to us in its original response brief. Therefore, according to Thompson, this court must assess his habeas petition as though Seibert were relevant for § 2254(d)(1) purposes.
We disagree. The Supreme Court has made clear that in adjudicating a claim or issue pending before us, we have the authority to identify and apply the correct legal standard, whether argued by the parties or not. Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 99, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991). Once “an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties.” Id. Instead, the court “retains the independent power to identify and apply the proper construction of governing law,” id., and is free to “consider an issue antecedent to ... and ultimately dispositive of the dispute before it, even an issue the parties fail to identify and brief,” U.S. Nat’l Bank of Oregon v. Ind. Ins. Agents of Am., Inc., 508 U.S. 439, 447, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993) (quoting Arcadia v. Ohio Power Co., 498 U.S. 73, 77, 111 S.Ct. 415, 112 L.Ed.2d 374 (1990)) (internal quotation marks omitted); see also In re Greene, 223 F.3d 1064, 1068, n. 7 (9th Cir.2000) (holding that the court could consider a statutory interpretation argument not specifically raised by the defendant because, “[w]hen an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties.” (quoting Ind. Ins. Agents, 508 U.S. at 446, 113 S.Ct. 2173)).
For the same reason, “parties are not limited to the precise arguments they made below.” Lebron v. National R.R. Passenger Corp., 513 U.S. 374, 379, 115 S.Ct. 961, 130 L.Ed.2d 902 (1995); see also Citizens United v. Fed. Election Comm’n, 558 U.S. 310, 130 S.Ct. 876, 893, 175 L.Ed.2d 753 (2010) (allowing plaintiffs to raise a new argument on appeal to support a “consistent claim” that a statute violated First Amendment rights); Engquist v. Oregon Dept. of Ag., 478 F.3d 985, 996 n. 5 (9th Cir.2007) (holding that we may hear new arguments on appeal if they are “intertwined with the validity of the claim”); United States v. Pallares-Galan, 359 F.3d 1088, 1095 (9th Cir.2004) (“[I]t is claims that are deemed waived or forfeited, not arguments.”). Thus, we may consider new legal arguments raised by the parties relating to claims previously raised in the litigation.[2]
Here, Thompson’s claim that he is entitled to habeas relief because the state trial court violated his Fifth Amendment rights by failing to suppress his post-Miranda statements is properly pending before us. Under AEDPA, we may not grant habeas relief unless the state appellate court’s adjudication of this claim “resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,” § 2254(d)(1). In order to resolve the question whether the state court’s decision met this standard, we must first address the antecedent question whether Elstad or Seibert is the relevant “clearly established Federal law.” § 2254(d)(1). We have the authority to identify and apply the correct governing law necessary to dispose of the *1099 claim pending before us, Ind. Ins. Agents of Am., Inc., 508 U.S. at 447, 113 S.Ct. 2173, and thus we do not abuse our discretion by determining that Elstad is the relevant clearly established Supreme Court precedent, id.
The Supreme Court’s recent decision in Wood v. Milyard, — U.S.-, 132 S.Ct. 1826, 182 L.Ed.2d 733 (2012), is not contrary to this conclusion. In Wood, a federal appellate court asked the state to provide supplemental briefing regarding a statute of limitations defense to a habeas petition, and subsequently dismissed the habeas petition as untimely. The Supreme Court held the federal court abused its discretion by considering, sua sponte, an affirmative defense that had been deliberately waived by the state. (The state had twice informed the court that it was not challenging the timeliness of the habeas petition.) Id. at 1830.[3]
Wood’s holding is not applicable to our consideration of the correct interpretation of § 2254(d)(1), which is not an affirmative defense.[4] See Cullen v. Pinholster, —— U.S. -, 131 S.Ct. 1388, 1398, 179 L.Ed.2d 557 (2011) (“The petitioner carries the burden of proof’ with respect to § 2254(d)’s requirements); see also Price v. Vincent, 538 U.S. 634, 641, 123 S.Ct. 1848, 155 L.Ed.2d 877 (2003) (stating that “it is the habeas applicant’s burden to show that the state court applied [a Supreme Court case] to the facts of his case in an objectively unreasonable manner” under § 2254(d)(1)); Woodford v. Visciotti, 537 U.S. 19, 24, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (per curiam) (same). For the same reason, Thompson’s attempt to analogize our consideration of § 2254(d)(1) to the non-retroactivity principle established by Teague v. Lane, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), fails: the Teague non-retroactivity principle is also an affirmative defense that must be raised by the state. See Caspari v. Bohlen, 510 U.S. 383, 389, 114 S.Ct. 948, 127 L.Ed.2d 236 (1994) (holding that “a federal court may, but need not, decline to apply Teague if the State does not argue it,” but “if the State does argue that the defendant seeks the benefit of a new rule of constitutional law, the court must apply Teague before considering the merits of the claim”); see also Danforth v. Minnesota, 552 U.S. 264, 289-90, 128 S.Ct. 1029, 169 L.Ed.2d 859 (2008).
Although we are not barred from considering a new argument on appeal, we generally take care to avoid the unfairness inherent in deciding cases on bases not raised or passed upon in the tribunal below. For instance, we have held that we “will not ordinarily consider matters on appeal that are not specifically and dis- *1100 tinetly argued in appellant’s opening brief,” Koerner v. Grigas, 328 F.3d 1039, 1048 (9th Cir.2003), subject to certain exceptions, see Kimes v. Stone, 84 F.3d 1121, 1126 (9th Cir.1996).[5] Moreover, we have authority to decline to hear even new legal arguments not timely raised by the parties. See, e.g., James v. Ryan, 679 F.3d 780, 802 (9th Cir.2012).
In this case, however, it is appropriate to apply the correct legal standard to Thompson’s claim. The question whether the state court’s opinion should be measured against Elstad, or Seibert has been presented by both parties throughout this appeal.[6] After Greene was decided, both parties had an opportunity to brief the question regarding which Supreme Court precedent was the applicable clearly established federal law for purposes of § 2254(d)(1). Because the legal issue has been fully addressed by both parties, and because it is a simple and straightforward question of law, we do not abuse our discretion in addressing it. Ind. Ins. Agents of Am., Inc., 508 U.S. at 447, 113 S.Ct. 2173.[7]
IV
Thompson further contends that even if the state did not waive or forfeit its argument that Seibert is not applicable to his petition, we should stay the federal proceedings in order to allow him to seek reconsideration of his Miranda claim in state court in light of Seibert. He bases his argument on our decision in Gonzalez v. Wong, 667 F.3d 965 (9th Cir.2011), petition for cert. filed sub. nom Chappell v. Gonzales, — U.S.-, 133 S.Ct. 155, 184 L.Ed.2d 234 (2012). In that case, a prosecutor failed to turn over certain Brady materials to the petitioner until all state proceedings had been completed. Because the suppressed materials substantially strengthened the petitioner’s Brady claim, we remanded that portion of the petitioner’s case to the district court, with instructions to stay the habeas proceedings until the petitioner had an opportunity to present the new evidence to the California Supreme Court. Id. at 999.
Wong is not applicable here. In Wong, the petitioner argued that he had been unable to present his claim in state court because of the state’s suppression of evidence. Here, on the other hand, Thompson had all the evidence he needed to make his Seibert claim in state court after Seibert was announced, but he chose not to do so. Thompson’s situation is precisely the same as the petitioner’s in Greene. In rejecting the petitioner’s request for the Court to interpret “clearly established Federal law” to include Supreme Court precedent issued after the date of the relevant state court opinion, Greene noted that the petitioner’s “predicament [was] an un *1101 usual one of his own creation” because he had given up “two obvious means of asserting his claim” by failing to seek certio-rari in the Supreme Court or file a petition for state post-conviction relief. 132 S.Ct. at 45. Like the petitioner in Greene, Thompson also had the opportunity to seek certiorari in the Supreme Court, where he was likely to obtain a remand in light of Seibert, and to file a habeas petition in state court, but he did neither. We therefore decline to order a stay of federal proceedings.
y
Thompson’s habeas petition is governed by AEDPA, and the validity of his claim must be assessed under § 2254(d)(1). El-stad is the relevant “clearly established Federal law” for purposes of this § 2254(d)(1) analysis and, under Elstad, Thompson’s rights were not violated. Thompson’s petition is therefore denied.
AFFIRMED.

. He was also charged with torture in violation of California Penal Code § 206, but that charge was later dismissed.

. The dissent argues that these cases are not applicable because the state did not raise a new argument on appeal. Dis. op. at 1105 n. 4. This is incorrect; the state elaborated its argument that Seibert was not the relevant "clearly established Federal law" in the supplemental appellate briefs we ordered the parties to submit after the Supreme Court vacated our prior opinion.

. The dissent states that we err in limiting Wood to “a case regarding an 'affirmative defense' ” because it addresses waiver of both claims and defenses. Dis. op. at 1104 n. 3. We disagree. The specific issue in Wood was not whether an appellate court may decline to hear a waived claim or defense, but whether an appellate court abuses its discretion if it considers an issue that a party has waived. As to that issue, Wood's holding was narrow: it held only that it would be an abuse of discretion for an appellate court "to override a State’s deliberate waiver” of an affirmative defense. 132 S.Ct. at 1834-35. Nothing in Wood casts doubt on the longstanding validity of the rule that once "an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law.” Kamen, 500 U.S. at 99, 111 S.Ct. 1711.

. We apply this rule when a party raises a new claim, Kimes, 84 F.3d at 1126, but not when a party raises a new argument to support a claim already pending before the court, see In re Greene, 223 F.3d at 1068, n. 7.

. The state originally argued that Seibert was inapplicable because it was decided after the state court rendered its decision, and that, as a result, Thompson never exhausted his Seibert argument. See Blair v. California, 340 F.2d 741 (9th Cir.1965) (holding that even when a petitioner presented the substance of his claim to the state court, the petitioner had to reexhaust that claim if a later-decided Supreme Court opinion cast the claim in a different light). The Supreme Court's reasoning in Greene clarified that Seibert is inapplicable under § 2254(d)(1) for the same reason: it had not yet been decided at the time the state court rendered its decision. Therefore, the state's position that Thompson's Seibert-based argument was unexhausted is consistent with its current argument that Seibert is not clearly established Supreme Court precedent under Greene.

.In light of the narrowness of our holding, the dissent's parade of horribles, dis. op. at 1107, seems misplaced.