**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 21-30251 |
| *Plaintiff-Appellee*, | D.C. No. 3:18-cr-00130-TMB-MMS-1 |
| v. | |
| MARKANTHONY DELEON SAPALASAN, | OPINION |
| *Defendant-Appellant*. | |

Appeal from the United States District Court
for the District of Alaska
Timothy M. Burgess, District Judge, Presiding

Argued and Submitted September 12, 2023
Seattle, Washington

Filed April 1, 2024

Before: Michael Daly Hawkins, Ryan D. Nelson, and
Daniel P. Collins, Circuit Judges.

Opinion by Judge R. Nelson;
Concurrence by Judge R. Nelson;
Dissent by Judge Hawkins

# SUMMARY[*]

## Criminal Law

In a case in which Markanthony Sapalasan was convicted of drug felonies, the panel affirmed the district court's denial of Sapalasan's motion to suppress methamphetamine found during an officer's inventory search of Sapalasan's backpack.

The panel held that the police may constitutionally conduct an inventory search of belongings when the property is lawfully retained and the search is done in compliance with police regulations, even after the individual has been released. Distinguishing *Illinois v. Lafayette*, 462 U.S. 640 (1983), the panel wrote that because Sapalasan conceded that he was validly separated from his property, government custody of the backpack lawfully emerged. That separate custody allowed the government to conduct an inventory search of the backpack, and because that search was done in substantial compliance with police department policy, suppression of the evidence is unwarranted.

Concurring, Judge R. Nelson wrote separately to emphasize (1) he would reach the same conclusion on the lawfulness of the search by applying the principles laid out in *Lafayette*; and (2) he would not reach the merits of differentiating Alaskan state law because Sapalasan waived any reliance on *Zehrung v. Alaska*, 569 P.2d 189, 193, 195 (Alaska 1977), by failing to address it below.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Judge Hawkins dissented. Citing *Lafayette* and Ninth Circuit case law emphasizing the significance of impending incarceration on the propriety of a jailhouse inventory search, Judge Hawkins disagreed with the majority's conclusion regarding the inventory search of Sapalasan's backpack at the police station after Sapalasan—who was never booked, let alone incarcerated—had been released from questioning. Judge Hawkins wrote that the majority also refused to follow Ninth Circuit case law that requires consideration of whether the inventory search complied with existing state law requirements as part of the Fourth Amendment analysis.

## COUNSEL

Thomas E. Weaver (argued), The Law Office of Thomas E. Weaver, Bremerton, Washington, for Defendant-Appellant.

A. James Klugman (argued), Stephen Corso, and Karen Vandergaw, Assistant United States Attorneys; S. Lane Tucker, United States Attorney; United States Department of Justice, United States Attorney's Office, Anchorage, Alaska; Allison M. O'Leary, Assistant United States Attorney, United States Department of Justice, United States Attorney's Office, Civil Division/Environmental Torts Section, Washington, D.C.; for Plaintiff-Appellee.

# OPINION

R. NELSON, Circuit Judge:

Markanthony Sapalasan was arrested and his backpack was taken and searched. Sapalasan was then taken to the police station for questioning for potential involvement in a murder. After questioning, Sapalasan was released from detention. Around six hours later, at the end of his shift, Officer Tae Yoon conducted a routine inventory search of Sapalasan's backpack, which he had retained in his squad car. Officer Yoon found methamphetamine in the backpack. Sapalasan, convicted of two drug felonies, appeals the district court's denial of his motion to suppress the methamphetamine found during the search. We hold that the police may constitutionally conduct an inventory search of belongings when the property is lawfully retained and done in substantial compliance with police regulations, even after the individual has been released. Thus, we affirm.

## I

At about 2:30 am, Anchorage police officers Tae Yoon and Jonathan Behning responded to a call about gunshots at a nearby apartment. As they approached the vicinity of the apartment house, they met Markanthony Sapalasan, carrying a red backpack, and another individual walking away from the apartment house. Officer Behning noticed a pistol sticking out from Sapalasan's front pocket. In response, Behning drew his weapon, ordered Sapalasan not to move, and searched him for the weapon. He found the pistol loaded, with one round in the chamber and one round missing from the magazine.

Officer Yoon arrested Sapalasan, handcuffed him, and put him in his vehicle. Yoon retrieved Sapalasan's backpack and requested permission to search it. Sapalasan agreed. Yoon found no contraband during his search. Yet he learned that an individual had been found dead in the nearby apartment house with a single gunshot wound. So Yoon transported Sapalasan to the police station for further questioning regarding his potential involvement. Before departing for the police station, he placed Sapalasan's backpack in the front passenger seat of his squad car.

Sapalasan was interviewed at the police station. Yoon stayed only briefly during the interview before returning to the field to finish his shift, with Sapalasan's backpack still in his vehicle. After Yoon left, the interview was concluded and Sapalasan was released. Before the end of his shift at 9 am, Yoon returned to the station and conducted a detailed inventory search of the backpack to log potential evidence. During his inventory search, he found methamphetamine. He stopped the search and obtained a search warrant at around 8:22 am.

Sapalasan was charged with Possession with Intent to Distribute Methamphetamine and Possession of a Firearm in Furtherance of a Drug Trafficking Crime. He moved to suppress the methamphetamine on the ground that his backpack was searched without a proper warrant in violation of his Fourth Amendment rights. The magistrate judge recommended that his motion be denied, and the district court agreed. Sapalasan was found guilty of both charges. He now appeals based on what he claims was an unlawful search of his backpack.

## II

"We review de novo motions to suppress, and any factual findings made at the suppression hearing for clear error." *United States v. Basher*, 629 F.3d 1161, 1165 (9th Cir. 2011) (cleaned up).

## III

On appeal, the government first argues that the search of the backpack in the field was a valid search incident to arrest, or a legal inventory search. We need not resolve these issues. Even if we assume that these prior searches were unlawful, suppression is unwarranted because we conclude that Yoon executed a lawful inventory search at the police station.

When an individual is lawfully brought to a police station for booking into jail, the police may conduct an inventory search of that individual's belongings as part of the booking process. *See Illinois v. Lafayette*, 462 U.S. 640, 643 (1983). But the police did not search Sapalasan's backpack while he was detained for questioning, nor did they book him into jail. Instead, Officer Yoon separated Sapalasan from his backpack when he was arrested, and Yoon then retained lawful custody of it in his squad car during the rest of his shift. On appeal, Sapalasan concedes that "separating him from the backpack during transport and interrogation by detectives was lawful." And he concedes he was arrested on probable cause at the scene. After retaining custody of the backpack while Sapalasan was interviewed, Yoon conducted an inventory search of the backpack—at the end of his shift, around six hours later. Since Sapalasan was already released from detention, we must resolve whether the police may conduct an inventory

search under these circumstances. We conclude that they can.

In *Lafayette*, the Supreme Court held that under the Fourth Amendment, "it is reasonable for police to search the personal effects of a person under lawful arrest as part of the routine administrative procedure at a police stationhouse incident to booking and jailing the suspect." 462 U.S. at 643. The Court explained that a standardized inventory search process "not only deters false claims but also inhibits theft or careless handling of articles taken from the arrested person." *Id.* at 646. The dissent believes *Lafayette* only permits an inventory search "in the specific context of an arrestee who is about to be jailed."

But several critical concessions help distinguish *Lafayette* from the facts here. Sapalasan was lawfully separated from his backpack before Officer Yoon conducted the inventory search. Thus, Sapalasan was lawfully arrested, and Officer Yoon lawfully retained custody of Sapalasan's backpack. In *Lafayette*, the initial separation of the arrestee and his property occurred only as part of the booking process. 462 U.S. at 641–42. And the separation of this property created government custody that triggered the policy rationale in justifying an inventory search. Accordingly, the validity of the separation and the inventory search authority depended on whether Lafayette was going to jail. If someone at the stationhouse needs to be placed in the jail facilities, then that individual must be separated from whatever property is on his person.

Here, the lawfulness of the initial separation of Sapalasan from his backpack is unchallenged, so the justification of an inventory search *does not* depend on whether he was headed to jail. In an analogous case before

the First Circuit, a court upheld the inventory search of a towed vehicle that yielded a backpack containing drug paraphernalia. *See United States v. Rivera*, 988 F.3d 579, 580–82 (1st Cir. 2021). Like *Rivera*, it was immaterial whether the defendant faced jail time. *Id.* at 580–81. In fact, the defendant in *Rivera* was not even facing arrest. *Id.* at 580. Instead, what mattered was that the lawful separation of the defendant from the property created the government's lawful custody. In those cases, the policy rationales behind an inventory search are fully implicated and such a search may be undertaken in accordance with that doctrine's limitations.[1]

Under *Lafayette* and its progeny, an inventory search's primary limitation is that it must satisfy reasonable police regulations and be administered in good faith. *Lafayette*, 462 U.S. at 643. Sapalasan does not contest that Officer Yoon administered the search in good faith. Thus, we only need to address whether Yoon conducted the inventory search in compliance with Anchorage Police Department policy. Ensuring that the police follow standardized procedures helps prevent searches that rest on a concealed investigatory police motive. *See Colorado v. Bertine*, 479 U.S. 367, 375–76 (1987); *Lafayette*, 462 U.S. at 642.

---

[1] For the same reasons, *Zehrung v. Alaska*, 569 P.2d 189, 193, 195 (Alaska 1977), cited by the dissent, can be distinguished. Like in *Lafayette*, 462 U.S. at 641–42, it was the decision to proceed with the booking—in violation of state law—that led to the separation of Zehrung from his property and the need for an inventory search, *Zehrung*, 569 P.2d at 195. The separation of Sapalasan from his property occurred before the booking process, creating the government's concededly lawful custody of the backpack. That custody justifies an inventory search at the stationhouse regardless of whether Sapalasan had left the station or not.

Officer Yoon conducted the inventory search of the backpack at the end of his shift rather than right after obtaining custody of the backpack.  Yoon arguably did not conduct an "immediate" inventory search as required by the Anchorage Police Department policy.  Still, like the district court, we conclude that Yoon's search sufficiently followed Department policy to constitute a lawful inventory search. The Anchorage Police Department's "Evidence-Handling and Submission" Policy states that an inventory search be done "under the color of authority."  The policy adds that "all property collected under the color of authority shall be submitted on the date collected, received, seized, or no later than the end of the employee's assigned shift, or detail, directly to the Evidence Section[.]"

Although Officer Yoon did not "immediately make an inventory list" of Sapalasan's backpack, he still "submitted" the collected property at the end of his shift.  Yoon, therefore, substantially complied with department policy even if there were a minor deviation.  *United States v. Magdirila*, 962 F.3d 1152, 1158 (9th Cir. 2020) (finding that an officer "complied substantially" with Police Department Policy and that "[h]is failure to precisely comply with [it] did not render the [inventory] search invalid").  Moreover, because Yoon made "a list or inventory as soon as reasonable," the later inventory search is constitutional. *Lafayette*, 462 U.S. at 646.  Here, the delay in Yoon's inventory search was reasonable because he needed to handle other more urgent calls on dispatch during his shift. Accordingly, even though there was a delay in the inventory search, it was not unreasonable for Yoon to maintain custody of the backpack and conduct the inventory search at the end of his shift.  This substantially complied with department policy.  And because of this compliance, Yoon exercised a

lawful inventory search of Sapalasan's backpack at the stationhouse.

Last, Sapalasan argues that Yoon lacked probable cause to conduct the inventory search because, at that time, Sapalasan had been released from custody.  But the "justification for [inventory] searches does not rest on probable cause."  *Lafayette*, 462 U.S. at 643.  In fact, "probable cause to search is irrelevant in inventory searches." *Id.* (citation and quotation omitted).  Therefore, even if Yoon lacked probable cause to conduct an inventory search, it is immaterial in determining the search's constitutionality.

IV

The search of Sapalasan's backpack at the police stationhouse was a lawful inventory search.  Because Sapalasan conceded that he was validly separated from his property, government custody of the backpack lawfully emerged.  That separate custody allowed the government to conduct an inventory search of the backpack.  And because that search was done in substantial compliance with police department policy, suppression of the evidence is unwarranted.

**AFFIRMED.**

R. NELSON, Circuit Judge, concurring:

I write separately to emphasize two points.  First, I would reach the same conclusion on the lawfulness of Officer Tae Yoon's inventory search by applying the principles laid out in *Illinois v. Lafayette*, 462 U.S. 640, 643 (1983).  Second, I would not reach the merits of differentiating Alaskan state

law. Sapalasan waived any reliance on *Zehrung v. Alaska*, 569 P.2d 189, 193, 195 (Alaska 1977), by failing to address it below.

## I

I begin by discussing *Lafayette*'s full reasoning. There, the police arrested the defendant, brought him to the police station, and then searched his "purse-type shoulder bag," finding drug paraphernalia. 462 U.S. at 641–42. The Court's key consideration was whether it was "reasonable for police to search the personal effects of a person under lawful arrest as part of the routine administrative procedure at a police stationhouse incident to booking and jailing the suspect." *Id.* at 643. Because the officer testified that the search was standard procedure "to inventory 'everything' in the possession of an arrested person," the search was constitutional. *Id.* at 642.

Sapalasan's inventory search did not occur while he was detained. But the Supreme Court explained that courts must balance the search's "intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Id.* at 644 (quoting *Delaware v. Prouse*, 440 U.S. 648, 654 (1979)). A "range of governmental interests support an inventory process." *Id.* For example, a standardized inventory search process "not only deters false claims but also inhibits theft or careless handling of articles taken from the arrested person." *Id.* It can also help "guard the police from danger." *Colorado v. Bertine*, 479 U.S. 367, 372 (1987). The Court has affirmed these principles time and again when the inventory search follows reasonable police regulations in good faith. *See South Dakota v. Opperman*, 428 U.S. 364, 372 (1976); *Florida v. Wells,* 495 U.S. 1, 4 (1990). And the location of

that inventory search does not diminish the government's interest. Whether it's *Opperman*'s inventory search of an automobile's glove compartment, *Lafayette*'s search of personal possessions, or *Bertine*'s search of a closed backpack inventoried from an impounded van, the governmental interest is the same. *See Bertine*, 479 U.S. at 13 372–73 ("[T]he governmental interests justifying the [] inventory searches in *Opperman* and *Lafayette* are nearly the same as those which obtain here.").

So this court must decide whether Sapalasan's release from custody diminishes the inventory search's reasonableness. The dissent relies on *Lafayette*'s defining an inventory search as "an incidental administrative step *following arrest and preceding incarceration*." 462 U.S. at 644 (emphasis added). The argument goes that, since Sapalasan was released when Officer Yoon searched his backpack, the administrative necessity—and any other necessity—was extinguished. That conclusion, however, narrows *Lafayette* beyond recognition.

True, *Lafayette* and its progeny never clarified whether an inventory search at a police station required the arrestee to either face incarceration or momentary custody. But the underlying policy justifications for an inventory search do not turn on the arrestee's status. In *Lafayette*, the Court explained that inventory searches are reasonable because they "deter[] false claims" about the searched item's contents, "inhibit[] theft or careless handling of articles," and protect officers from any concealed "[d]angerous instrumentalities—such as razor blades, bombs, or weapons." *Id.* at 646. When Sapalasan's backpack was searched, it could have contained dangerous materials that needed to be identified. The police also had an incentive to fully inventory the backpack's contents, in case they needed

to either rebut false claims or deter theft. The delayed inventory search served these governmental interests, notwithstanding Sapalasan's release. Therefore, *Lafayette* itself shows that Officer Yoon's inventory search was lawful.

Our sister circuits' cases also bolster this conclusion. For example, the First Circuit upheld the inventory search of an impounded vehicle that yielded a backpack containing drug paraphernalia. *United States v. Rivera*, 988 F.3d 579, 580–82 (1st Cir. 2021). Even though the defendant faced neither incarceration nor arrest, *id.* at 580, the court found that checking for "dangerous items" and deterring "false claims of theft" justified the search. *Id.* at 582 (citing *Bertine*, 479 U.S. at 373) (internal quotations omitted). I agree. Sapalasan's status when his lawfully obtained bag was searched does not affect the policy rationale behind an inventory search. On this point, the dissent attempts to distinguish *Rivera* because it involved an impounded vehicle's inventory search. The dissent, of course, rightly argues that vehicles are subject to lower expectations of privacy. *New York v. Class*, 475 U.S. 106, 112–13 (1986). Regardless, the governmental interest in inventorying property lawfully in its possession remains strong. *See Bertine*, 479 U.S. at 367, 372. Whether searching automobiles or personal possessions, that interest outweighs the individual's Fourth Amendment interests. *See id.* at 372. So as *Rivera* noted, the government interest in *Lafayette* permeates *Rivera*, ensuring that police must inventory any items found in an impounded vehicle to identify dangerous items and prevent false theft claims. 988 F.3d at 582. Because of that, I see no reason to distinguish *Rivera*.

**II**

A final argument raised by the court, over a dissent, warrants brief discussion.  *See* Order (Sept. 7, 2023); *id.* (Collins, J., dissenting).  We asked the parties to address at oral argument how Alaska state law might influence our conclusion on the legality of the inventory search.  Ninth Circuit law states that courts should evaluate state law when considering an inventory search's lawfulness.  *See United States v. Cormier*, 220 F.3d 1103, 1111 (9th Cir. 2000).  For example, in *United States v. Peterson*, the court looked to Washington law when it held that Washington police could not conduct an inventory search if the arrestee could avoid incarceration by posting bail.  902 F.3d 1016, 1020 (9th Cir. 2018) (citing *Washington v. Smith*, 783 P.2d 95, 98 (Wash. Ct. App. 1989)).  At our request, Sapalasan argued at oral argument that similar Alaskan state law prohibits inventory searches before the arrestee can post bail.  *See Zehrung*, 569 P.2d at 195.  The government argued that this issue was waived.  *See United States v. Guerrero*, 921 F.3d 895, 897 (9th Cir. 2019).

Our majority makes clear why *Zehrung* does not apply to the case here.  Yet, I write separately to explain why we need not reach this new argument's merits.  At the suppression hearing, Sapalasan never challenged the inventory search under this theory interpreting the Alaska Constitution.  We once held that "[a] theory for suppression not advanced in district court cannot be raised for the first time on appeal."  *United States v. Keesee*, 358 F.3d 1217, 1220 (9th Cir. 2004).  The Federal Rules of Criminal Procedure have since softened that categorical rule.  Now, "[i]f a party does not meet the deadline for making a Rule 12(b)(3) motion, the motion is untimely.  But a court may consider the defense, objection, or request if the party shows

good cause." Fed. R. Crim. P. 12(c)(3). We now hold that defendants waive new suppression arguments absent "good cause for failing to present in [a] pre-trial motion the new theory for suppression he raises in this appeal." *Guerrero*, 921 F.3d at 897.

I find no reason to deviate from *Guerrero*. Nowhere in the suppression motion did Sapalasan challenge the second backpack search under *Zehrung* or the Alaska Constitution. Nor did Sapalasan raise this issue here—until invited to do so. Sapalasan has not shown good cause as to why this theory was not presented below. To consider it now would violate the party presentation principle. *See United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020). For these reasons, I would decline to consider the merits of *Zehrung* in addressing the inventory search's legality.

HAWKINS, Circuit Judge, dissenting:

I respectfully disagree with the majority's conclusion regarding the inventory search of Sapalasan's backpack at the police station after he had already been released from questioning. In the Supreme Court's landmark holding on stationhouse inventory searches in *Illinois v. Lafayette,* 462 U.S. 640 (1983), the Court concluded: "We hold it is not unreasonable for police, as part of the routine procedure *incident to incarcerating an arrested person*, to search any container or article in his possession, in accordance with established inventory procedures." 462 U.S. at 648 (emphasis added).

Although the majority relies principally on the initial separation of Sapalasan from his backpack, the Court

emphasized the specific context of the inventory search on at least four separate occasions in the opinion, concluding that such a search was reasonable in balancing the policy considerations underlying the search and *the specific context of an arrestee who is about to be jailed* (and thus about to be separated from his belongings for some extended period of time):

- "The question here is whether, consistent with the Fourth Amendment, it is reasonable for police to search the personal effects of a person under lawful arrest as part of the routine administrative procedure at a police stationhouse *incident to booking and jailing the suspect*." *Id*. at 643 (emphasis added).

- "[T]he factors justifying a search of the person and personal effects of an arrestee upon reaching a police station *but prior to being placed in confinement* are somewhat different from the factors justifying an immediate search at the time and place of arrest," and also noting that "an arrested person is not invariably taken to a police station or confined. *Id.* at 645 (emphasis added).

- "At the stationhouse, it is entirely proper for police to remove and list or inventory property found on the person or in the possession of *an arrested person who is to be jailed*." *Id.* at 646 (emphasis added).

Another telling indication that the Supreme Court found the impending incarceration to be of critical importance is that it *remanded* the case so that the lower court could determine if the defendant was actually going to be imprisoned, as Lafayette's arrest was only for a misdemeanor of disturbing the peace: "The record is unclear

as to whether respondent *was to have been incarcerated* after being booked for disturbing the peace. That is an appropriate inquiry on remand." *Id.* at 648 n.3 (emphasis added). If the incarceration status was unimportant to the analysis, the Court could have simply affirmed without remanding.

Our Ninth Circuit case law has also emphasized the significance of impending incarceration on the propriety of a jailhouse inventory search. In *United States v. Peterson*, the defendant moved to suppress evidence found during a jailhouse inventory search because he was arrested only for misdemeanor warrants, and under Washington law could have posted bail to avoid incarceration (and the search). 902 F.3d 1016, 1020 (9th Cir. 2018). Significantly, we *agreed* with the defendant that the inventory search *would have been unlawful* if the officers had conducted the search prior to providing the defendant the opportunity to post bail. *Id.* at 1020. However, the arresting officer had also testified at the suppression motion that if Peterson had posted bail on the misdemeanor charge, the officer would have instead booked and incarcerated Peterson on a charge of resisting arrest for which no bail had been set; we therefore affirmed the denial of the motion to suppress under the doctrine of inevitable discovery. *Id.*

Neither the government nor the majority have cited a published case upholding a stationhouse inventory search of someone's belongings who was not also in the process of being booked and incarcerated. The government principally relies on *Colorado v. Bertine*, 479 U.S. 367 (1987), which permitted an inventory search of an impounded vehicle, and the majority relies on *United States v. Rivera*, 988 F.3d 579, 580–82 (1st Cir. 2021), which also involved an impounded vehicle where the defendant was not under arrest. But

vehicles have long been recognized as subject to lower expectations of privacy, *New York v. Class*, 475 U.S. 106, 112–13 (1986), and there are various reasons apart from arrest and incarceration, including the community caretaking function, in which the police may need to impound a vehicle encountered in the field and conduct an inventory search in conjunction with such impound. But even then, we have recognized that the *initial* impound and inventory justification *can dissipate* depending on the factual circumstances; if, for example, a licensed driver arrives on scene who could take possession of the vehicle instead. *See Sandoval v. County of Sonoma*, 912 F.3d 509, 516–17 (9th Cir. 2018).

In this case, Sapalasan was never booked, let alone incarcerated. He was questioned by police, determined to be a witness to—but not a suspect in—the shooting, and released. Like an arrestee who makes bail to avoid incarceration, or the arrested driver of a vehicle who provides an alternate person to retrieve his car, Sapalasan's release after questioning obviated any continuing justification for the police to hold or search his property. I am thus unconvinced by the majority's emphasis on the initial separation of Sapalasan from his backpack, as it ignores the reality of the circumstances at the time of the actual inventory search.

The majority also refuses to follow Ninth Circuit case law that *requires* us to consider whether the inventory search complied with existing state law requirements as part of the Fourth Amendment analysis. Ordinarily, when applying

federal constitutional law, we need not make such an inquiry. But as we explained in *United States v. Cormier*:

> There are two exceptions to the general rule that state law violations do not require suppression of evidence in federal court. The first exception arises when a court is determining the legality of an inventory search, because "federal law on inventory searches by state or local police officers *[requires] that they must be conducted in accordance with the official procedures of the relevant state or local police department.*

220 F.3d 1103, 1111 (9th Cir. 2000) (emphasis added).

In *United States v. Wanless*, we thus analyzed the defendant's Fourth Amendment claim pertaining to the legality of a vehicle inventory search by looking first to Washington law. We noted that the Washington State Trooper's manual appeared to require an inventory search of *any* impounded vehicle, but we also recognized that "Washington courts have placed a limitation on the search requirement." 882 F.2d 1459, 1463 (9th Cir. 1989). Washington case law requires troopers to first ask the owner, if present, if he would consent to the vehicle search; the person then has the option to decline, take the chance that loss will occur, and avoid the search. *Id.* We concluded that the trooper's failure to follow this state-court-imposed limitation on their inventory search procedure rendered the resulting search illegal under the federal constitution, even though it was otherwise conducted in accordance with the police manual. *Id.*

So, too, here, there is a procedure manual that appears to authorize an inventory search of virtually any item that comes into the police's possession. But there is also Alaska case law holding that a warrantless stationhouse inventory search is without justification *when an arrestee is not going to be incarcerated*, and imposing additional obligations on officers, such as permitting the arrestee a reasonable opportunity to make bail and to avoid incarceration and the corresponding search. *Zehrung v. State of Alaska*, 569 P.2d 189, 193, 195 (Alaska 1977) ("We recognize that our decision necessitates invalidating a standard procedure at the jail."); *Gray v. State of Alaska*, 798 P.2d 346 (Alaska 1990) (reiterating that, absent specific exigencies, even if an arrestee is to be placed in a holding cell while being given a reasonable time to make bail, only a limited patdown for weapons is permissible, and a full inventory search can only be conducted if the person is to be incarcerated).[1] In other words, conducting an inventory search pursuant to a broad department policy does not constitutionally authorize every inventory search, particularly if the law of that state has judicially limited that authority to certain situations (such as when an impounded car's owner gives consent or when an arrestee is actually going to be incarcerated).[2]

---

[1] The Anchorage police department has apparently paid little attention to these decisions. In 2000, an Alaska court of appeals judge noted in a concurrence that it appeared the Anchorage jail was still conducting inventory searches of all arrestees, including those who could make bail, and that "these procedures are essentially the same ones declared illegal twenty years ago in *Zehrung*." *Castleberry v. State*, 2000 WL 530686 *4-5 (Ala. Ct. App. 2000).

[2] Certainly, these Alaska cases do not cover the specific situation in this case, in which the person was never booked or incarcerated. Predicting

It is true that Sapalasan did not cite *Zehrung* in district court or in his opening brief. However, he clearly raised the *claim* that the stationhouse inventory search was invalid under the Fourth Amendment and cited analogous Ninth Circuit cases such as *Peterson,* which in turn looked to underlying state law to determine the propriety of the search. *See Peterson*, 902 F.3d at 1020. As we explained in *Thompson v. Runnels*:

> Once "an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties." [*Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99, (1991).] Instead, the court "retains the independent power to identify and apply the proper construction of governing law," *id.*, and is free to "consider an issue antecedent to . . . and ultimately dispositive of the dispute before it, even an issue the parties fail to identify and brief," *U.S. Nat'l Bank of Oregon v. Ind. Ins. Agents of Am., Inc.*, 508 U.S. 439, 447 (1993) (quoting *Arcadia v. Ohio Power Co.*, 498 U.S. 73, 77 (1990)) (internal quotation marks omitted); *see also In re Greene*, 223 F.3d 1064, 1068, n. 7 (9th Cir.2000) (holding that the court could consider a statutory interpretation argument

---

state law based on existing precedents, it seems reasonable to think that Alaska courts would expect Sapalasan to be given a reasonable amount of time to retrieve his backpack from the station prior to a caretaking inventory, much as an arrestee must be given a reasonable amount of time to make bail. We could also certify the question to the Alaska Supreme Court for clarity.

not specifically raised by the defendant because, "[w]hen an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties." (quoting *Ind. Ins. Agents*, 508 U.S. at 446)).

705 F.3d 1089, 1098 (9th Cir. 2013).

We are required to consider whether the inventory search Sapalasan challenged was authorized and conducted in accordance with state law in order to determine his clearly raised federal claim. *Comier*, 220 F.3d at 1111. Having raised the appropriate legal claim, it is our duty to determine its merits, which in turn necessitates investigating Alaskan law, whether Sapalasan cited the case or not.

I would grant Sapalasan's motion to suppress the contents of the backpack.